**CADCO, INC. and Bankers National, Inc. d/b/a/ Imperial Homes, Inc., Respondents/Cross–Appellants,**

v.

**FLEETWOOD ENTERPRISES, INC., and Fleetwood Homes of Texas, L.P., Successor to Fleetwood Homes of Texas, Inc., Appellants/Cross–Respondents.**

No. ED 87066.

Missouri Court of Appeals,
Eastern District,
Division One.

March 20, 2007.

Motion for Rehearing and/or Transfer to Supreme Court Denied April 23, 2007.

Application for Transfer Denied
May 29, 2007.

428

Mark G. Arnold, St. Louis, MO, Husch & Eppenberger, Patrick Phillips, Co–Counsel, Clayton, MO, William H. Latham, Co–Counsel, Columbia, SC, for Appellant Fleetwood Enterprises and Fleetwood Homes of Texas.

John E. Toma, Jr., St. Louis, MO, for Respondent CADCO and Bankers National.

Before CLIFFORD H. AHRENS, P.J., MARY K. HOFF, J., and NANNETTE A. BAKER, J.

## *OPINION*

PER CURIAM.

Fleetwood Enterprises, Inc., and Fleetwood Homes of Texas, L.P., (collectively referred to as Fleetwood) appeal from the trial court's final amended judgment entered upon a jury verdict in favor of CADCO, Inc., and Bankers National, Inc., doing business as Imperial Homes, Inc., (collectively referred to as CADCO) and awarding damages on Count V of CADCO's third amended petition, which claimed that Fleetwood fraudulently misrepresented and negligently misrepresented its intentions with regard to a series of retail seller agreements between the parties. CADCO cross-appeals from the trial court's pre-trial order and judgment granting, in part, and denying, in part, Fleetwood's motion for summary judgment as to Counts I, II, III, and IV of CADCO's third amended petition and from the portion of trial court's final amended judgment offsetting the total award of damages by $35,000 to account for a settlement between CADCO and Coachman Homes, Inc. (Coachman), a defendant that had been dismissed prior to trial.

We affirm the trial court's amended final judgment with respect to the three points presented in Fleetwood's appeal. Under the circumstances of this case, we find the first point presented in CADCO's cross-appeal to be moot.[1] We affirm as modified

---

1. CADCO's Motion to Strike Fleetwood's first point on appeal and CADCO's Motion to Dismiss Fleetwood's appeal are denied.

the trial court's final amended judgment with respect to second point presented in CADCO's cross-appeal pursuant to Rule 84.14.

### Facts and Procedural History

The facts in the light most favorable to the verdict are as follows: CADCO, a Missouri corporation, was a mobile home retailer with sales and service centers in Arnold and Bonne Terre. Fleetwood, a mobile home manufacturer based in California, supplied retailers with homes produced by some of its various subsidiaries.

In August 1998, CADCO's president, Cort Dietz (Dietz), and Fleetwood's regional marketing manager, Tom Friedman (Friedman), entered into a retail sales agreement (1998 Retail Agreement). CADCO agreed to sell certain models of Fleetwood's mobile homes for a period of five years, and Fleetwood agreed to provide CADCO an exclusive product territory in which to sell those models. The 1998 Retail Agreement contained an "Exclusive Rights and Territory" clause, which provided that, as long as CADCO maintained an inventory of Fleetwood's products constituting at least fifty percent of CADCO's total inventory, Fleetwood would not sell or distribute certain models of its mobile homes to any of CADCO's competitors within the exclusive product territory except as agreed upon by the parties. Attached to the 1998 Retail Agreement was a handwritten addendum prepared by Friedman indicating that only CADCO would sell certain models produced by Fleetwood within CADCO's exclusive product territory, known as the St. Louis Basic Trading Area (St. Louis BTA). In early 1999, Fleetwood and CADCO further agreed that CADCO also would sell the Crown Pointe model produced by Fleetwood's manufacturing plant in Westmoreland, Tennessee, and that only one of CADCO's competitors within the St. Louis BTA, 21st Century, would be permitted to sell Crown Pointe. Later, however, Fleetwood redesigned Crown Pointe to be nearly identical to the Sun Pointe model, a mobile home Fleetwood distributed to Coachman, CADCO's chief competitor in the St. Louis BTA.

In the fall of 1999, Dietz and Friedman began negotiating an exclusive retail sales agreement (Pinnacle Agreement). Under the Pinnacle Agreement, CADCO would be known as a Pinnacle Retailer and would sell mobile homes manufactured only by Fleetwood, and Fleetwood would provide CADCO with certain benefits available only to Pinnacle Retailers, including enhanced selling volume incentives, increased allowances for advertising, reductions in training costs, and promotional programs. Fleetwood also would grant CADCO a right of first refusal with respect to any new product Fleetwood offered in the St. Louis BTA, including the Meadowbrook model produced by Fleetwood's manufacturing plant in Gallatin, Tennessee. CADCO's right of first refusal with respect to Meadowbrook was central to Dietz and Friedman's discussions concerning the Pinnacle Agreement because Meadowbrook was a desirable mid-priced product new to the St. Louis BTA, and CADCO needed such a product to be able to provide buyers with a range of options and prices. Dietz believed the timing for transforming CADCO into a Pinnacle retailer was perfect because CADCO would be able to introduce Meadowbrook into the St. Louis BTA in the early spring of 2000 as a replacement for its inventory of non-Fleetwood mobile homes, which CADCO was required to liquidate under the Pinnacle Agreement. In late December 1999, Dietz decided that CADCO would become a Pinnacle Retailer, and Dietz and Friedman prepared a letter memorializing some of the topics Dietz and Friedman had dis-

cussed during their negotiations. CADCO and Fleetwood thereafter exchanged letters confirming CADCO's status as a Pinnacle Retailer and noting the effective date of CADCO's status was January 31, 2000. However, in March 2000, Fleetwood informed Dietz that CADCO would not have a right of first refusal on Meadowbrook as Fleetwood had decided to award that product to Coachman in the St. Louis BTA.

Over the next two years, CADCO and Fleetwood's business relationship deteriorated, and CADCO filed a seven-count petition against Fleetwood and Coachman. Counts I, II, III, and IV alleged Fleetwood had breached the terms of the 1998 Retail Agreement. Count V alleged Fleetwood made numerous verbal and written intentionally fraudulent misrepresentations to CADCO indicating that, in exchange for CADCO becoming a Fleetwood retailer, Fleetwood promised to provide product protection for CADCO in the St. Louis BTA for certain models of Fleetwood's mobile homes, including the Crown Pointe model, even though Fleetwood had no present intention to give CADCO a protected territory for those products at the time the agreement was made. Count V further alleged Fleetwood made negligent misrepresentations to CADCO indicating that, in exchange for CADCO becoming a Fleetwood Pinnacle Retailer who sold only Fleetwood-manufactured products, CADCO would have a right of first refusal on all new Fleetwood products introduced into the St. Louis BTA, specifically the Meadowbrook model, even though Fleetwood knew or, by using ordinary care, could have known that Coachman already had been authorized to sell the Meadowbrook in the St. Louis BTA. Count VI alleged that Coachman individually had committed tortious interference "by participating with Fleetwood in effectuating its 'dual penetration' scheme," and Coachman had purchased and sold manufactured

homes that should have been provided exclusively to CADCO. Count VII alleged that Fleetwood and Coachman together had committed civil conspiracy by agreeing "to take business away from [CADCO] and to build up Coachman so that Coachman would be the only surviving Fleetwood Retailer in the St. Louis BTA."

Fleetwood filed its answer and, later, a motion for summary judgment. The trial court subsequently granted Fleetwood's motion for summary judgment on Counts I, II, III, and IV without explanation.

On April 29, 2005, CADCO and Coachman filed a Stipulation of Dismissal dismissing, with prejudice, CADCO's claims against Coachman contained in Counts VI and VII of CADCO's third amended petition according to the terms of their confidential settlement agreement. The trial court thereafter entered an order dismissing, with prejudice, CADCO's claims against Coachman.

Three days later, CADCO and Fleetwood proceeded to trial on CADCO's fraudulent misrepresentation and negligent misrepresentation claims contained in Count V of CADCO's third amended petition. After a trial in excess of two weeks, the jury found in favor of CADCO, assessing $475,675 in actual damages on the fraudulent misrepresentation claim, $784,071 in actual damages on the negligent misrepresentation claim, and $650,000 in punitive damages. On the negligent misrepresentation claim, the jury allocated fault between the parties: 76% to Fleetwood and 24% to CADCO. Consequently, the trial court reduced CADCO's award on that claim to $595,894. The trial court also reduced the total award by $35,000 as an offset for the settlement CADCO had received from Coachman and assessed costs against Fleetwood in the amount of $13,783.18. The trial court entered an

amended final judgment awarding CADCO a total amount of $1,700,352.18.

Additional facts will be discussed as necessary to our analysis of the issues on appeal.

### Fleetwood's Point I

In its first point on appeal, Fleetwood claims the trial court erred in allowing CADCO's expert witness, Kevin Carlie (Carlie), to render opinions about CADCO's lost profits because Carlie's opinions were insufficiently reliable to satisfy Section 490.065.3 in that there was no foundation on which Carlie could base his "key assumption" that CADCO would have sold all of the Fleetwood units that CADCO's competitor, Coachman, sold.

 Usually, we review the admissibility of an expert witness' opinion testimony under an abuse of discretion standard. *Eagan v. Duello*, 173 S.W.3d 341, 346 (Mo. App. W.D.2005). However, the record in this case indicates that Fleetwood's claim was not properly preserved for review; thus, our review will be for plain error only.[2]

 "Plain errors affecting substantial rights may be considered on appeal, in the discretion of the court, though not raised or preserved, when the court finds that manifest injustice or miscarriage of justice has resulted therefrom." Rule 84.13(c). Plain error is, on its face, error that is evident, obvious, and clear. *Wilson ex rel. Wilson v. Simmons*, 103 S.W.3d 211, 220 (Mo.App. W.D.2003). Relief under the plain error standard is rarely granted in civil cases and is reserved for those situations in which hatred, passion, or prejudice has been engendered, resulting in manifest injustice or a miscarriage of justice. *Eagan*, 173 S.W.3d at 348; *Buatte v. Schnuck Markets, Inc.*, 98 S.W.3d 569, 573 (Mo.App. E.D.2002).

The relevant standard governing the admission of expert witness testimony is set out in Section 490.065.[3] *State Board of Registration for the Healing Arts v. McDonagh*, 123 S.W.3d 146, 153 (Mo. banc 2003). Section 490.065 provides, in pertinent part:

> In any civil action, scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise.
>
> . . .
>
> The facts or data in a particular case upon which an expert bases an opinion

---

**2.** Fleetwood, citing *Thomas v. Festival Foods*, 202 S.W.3d 625, 627 (Mo.App. W.D.2006), and *Spain v. Brown*, 811 S.W.2d 417, 423 (Mo.App. E.D.1991), asserts that it is entitled to de novo review of its claim because the issue to be determined is whether Carlie's opinion was supported by a proper foundation. We note that *Festival Foods* and *Spain* are distinguishable. In each of those cases, the opponent to the admission of expert opinion testimony specifically objected on the record to the admission of that testimony on the ground the opinion was not supported by facts in evidence and without foundation. *See Festival Foods*, 202 S.W.3d at 626–27; *Spain*, 811 S.W.2d at 423. Here, however, the record reveals that Fleetwood did not make a specific and recorded objection to Carlie's opinion testimony concerning lost profits. In fact, Fleetwood failed to object when Carlie was called as a witness, when he was qualified as an expert witness, when he rendered his opinion concerning lost profits as the measure of damages, or when his testimony concluded. Notably, Fleetwood also failed to object when Carlie described his method of analysis for determining lost profits, including a summary of the facts and data on which he based that analysis and his resulting opinion.

**3.** All statutory citations are to RSMo 2000, unless otherwise indicated.

or inference may be those perceived by or made known to him at or before the hearing and must be of a type reasonably relied upon by experts in the field in forming opinions or inferences upon the subject and must be otherwise reasonably reliable.

Section 490.065.1, 3.

■■ Usually, an expert witness' opinion testimony is based upon facts that the expert did not personally observe and of which the expert did not have personal knowledge. *Eagan,* 173 S.W.3d at 351. Under Missouri law, however, the facts or data on which experts rely in forming their opinions need not be independently admissible as long as the evidence satisfies the two requirements of Section 490.065.3. *Peterson v. National Carriers, Inc.,* 972 S.W.2d 349, 355 (Mo.App. W.D.1998). First, in determining whether the facts and data are reasonably relied upon by experts in the field, the trial court is generally expected to defer to the expert's assessment of which data is reasonably reliable. *Goddard v. State,* 144 S.W.3d 848, 854 (Mo.App. S.D.2004). The practice of allowing an expert to testify as to facts and data of a type reasonably relied upon by experts in the field is justified by the premise that a witness with specialized knowledge is as competent to evaluate the reliability of the statements presented by other investigators or technicians as competent as a fact-finder is to pass upon the credibility of an ordinary witness on the stand. *Id.* Second, in determining whether the facts and data otherwise are reasonably reliable, the trial court must look beyond the expert's testimony to ensure that the sources relied upon by the expert are not so slight as to be fundamentally unsupported. *Id.*

■■ Lost profits are recoverable in a variety of contract, tort, and business interruption cases. *Ameristar Jet Charter,* *Inc. v. Dodson International Parts, Inc.,* 155 S.W.3d 50, 55 (Mo. banc 2005). The term "loss of profits" refers to the amount of net profits the plaintiff would have realized had its clients not been lost as a result of the defendant's actions. *Id.* at 54. An estimate of prospective or anticipated profits must rest on more than mere speculation; however, uncertainty as to the amount of profits that otherwise would have been made does not prevent recovery. *Id.* at 54–55. In tort actions, the plaintiff must establish the *fact* of damages with reasonable certainty even though it is not always possible to establish the *amount* of damages with the same degree of certainty. *Id.* at 55. In cases involving the interruption of an established business, damages for loss of profits may be recovered where reasonably certain proof shows the amount of those profits; the presentation of facts establishing the income and expenses of the business for a reasonable time before its interruption and the net profits during that previous period is essential to this determination. *Harvey v. Timber Resources, Inc.,* 37 S.W.3d 814, 818 (Mo.App. E.D.2001), *citing Coonis v. Rogers,* 429 S.W.2d 709, 714 (Mo.1968); *Gesellschaft Fur Geratebau v. GFG America Gas Detection, Ltd.,* 967 S.W.2d 144, 147 (Mo.App. E.D.1998). Accordingly, it is reasonable to require the plaintiff to prove past profits to show how the defendant's actions affected the plaintiff's profits. *Harvey,* 37 S.W.3d at 818.

■■ Here, we find no plain error. At trial, CADCO presented Carlie's expert testimony to establish the amount of lost profits CADCO had incurred after becoming a Fleetwood retailer. Carlie testified that he had a bachelor's degree in economics, a master's degree in accounting and taxation, and was a member of several professional organizations. Carlie further testified that he was a certified public ac-

countant and a certified financial valuation analyst. Carlie testified he also was president of Stone Carlie and Company, a certified public accounting firm in St. Louis County that provided a variety of financial services, including auditing, tax counseling, tax compliance, assistance with mergers and acquisitions, and consulting. After being qualified as an expert without objection, Carlie testified that he had determined the appropriate analysis to use in evaluating CADCO's damages was a lost profits theory. The lost profits theory was based on the premise that, but for the occurrence of certain factors in the market, CADCO would have incurred additional profits. In arriving at the amount of total lost profits CADCO sustained, Carlie prepared two reports in which he analyzed the number of unauthorized sales of mobile home units Coachman made that should have been or could have been sold by CADCO, the average profit margin on the units sold, and the business expenses involved in making those sales. Carlie then adjusted the analysis to account for the competition Coachman's unauthorized presence added to the marketplace based on the belief that the best measure for determining the amount of lost profits was looking at the evidence of "what happened in the market." Carlie also considered CADCO's record as "proven seller in this BTA." Carlie testified that he collected data for the reports from interviews of Dietz, who was, in Carlie's judgment, a "good businessman." Carlie also examined CADCO's corporate tax returns, financial statements, income statements, and expense statements. Carlie also studied: Coachman's sales records; Missouri Public Service Commission reports detailing Coachman's sales; Fleetwood's financial information, including its financial statements and industry forecasts, BTA analyses, sales invoices, rebate calculations, and supporting documentation; and

Fleetwood's product bulletin and newsletter from January 2002. Significantly, Carlie further testified that he studied the depositions of and the reports prepared by Fleetwood's expert witnesses, who testified at trial for Fleetwood. We also note that Fleetwood's counsel extensively cross-examined Carlie regarding the basis for his expert testimony. We conclude that Carlie's evidentiary foundation was sufficiently reliable and adequately supported his opinion testimony concerning CADCO's lost profits; thus, the trial court did not plainly err in allowing Carlie to render his opinion on that subject. Point denied.

### Misrepresentation Claims

In its second and third points on appeal, Fleetwood challenges the trial court's submission of CADCO's fraudulent misrepresentation and negligent misrepresentation claims to the jury. Our standard of review is the same for both points.

 In determining whether a plaintiff has made a submissible case against the defendant, we view the evidence in the light most favorable to the plaintiff, presume his evidence is true, give him the benefit of all reasonable and favorable inferences drawn therefrom, and disregard all evidence to the contrary. *Mprove v. KLT Telecom, Inc.,* 135 S.W.3d 481, 489, 494 (Mo.App. W.D.2004). However, we will not infer any fact essential to submissibility in the absence of a substantial evidentiary basis. *Id.* at 489. We will not "supply missing evidence or give the plaintiff the benefit of unreasonable, speculative, or forced inferences." *Id.* (internal quotations omitted). Because liability cannot rest upon guesswork, conjecture, or speculation beyond inferences reasonably drawn from the evidence presented, the trial court should not submit a case to the jury unless each and every fact essential to

liability is based upon legal and substantial evidence. *Id.*

### Fraudulent Misrepresentation Claim

In its second point, Fleetwood argues the trial court erred in submitting to the jury the claim stated in Instruction No. 7 concerning fraudulent misrepresentation because CADCO presented no evidence from which the jury could find that Fleetwood fraudulently misrepresented its intent to grant CADCO product protection or to award CADCO an exclusive sales territory with regard to Crown Pointe.

The elements of fraudulent misrepresentation are: 1) a false material representation; 2) the speaker's knowledge of the falsity of the misrepresentation or ignorance of the truth; 3) the speaker's intent that the hearer act upon the misrepresentation in a manner reasonably contemplated; 4) the hearer's ignorance of the falsity of the misrepresentation; 5) the hearer's reliance on its truth; 6) the hearer's right to rely thereon; and 7) the hearer's consequent and proximately caused damages. *Id.* at 489–90; *Roth v. Equitable Life Assurance Society,* 210 S.W.3d 253, 258 (Mo.App. E.D.2006); *Urologic Surgeons, Inc. v. Bullock,* 117 S.W.3d 722, 725–26 (Mo.App. E.D.2003). If a plaintiff fails to establish any one of these elements, his claim also will fail. *Mprove,* 135 S.W.3d at 490.

In the argument portion of its brief, Fleetwood specifically challenges the sufficiency of CADCO's evidence with regard to the third element of its fraudulent misrepresentation claim, i.e., that CADCO failed to present any evidence that Fleetwood did not intend to grant CADCO a protected or exclusive territory in which to sell Fleetwood's products, including Crown Pointe, at the time CADCO agreed to become a Fleetwood retailer. It is well-settled that an unkept promise does not constitute actionable fraud unless the promise is accompanied by the defendant's present intent not to perform, which constitutes a misrepresentation of a present state of mind, itself an existent fact. *Roth,* 210 S.W.3d at 259; *Urologic Surgeons, Inc.,* 117 S.W.3d at 726. The fact that the defendant did not perform as promised is not enough, and, without more, the plaintiff cannot show that the defendant did not intend to perform when the promise was made. *Id.* Fraud must not be presumed, but, because fraud is rarely susceptible of positive proof, the plaintiff may prove his case by circumstantial evidence. *Professional Laundry Management Systems, Inc. v. Aquatic Technologies, Inc.,* 109 S.W.3d 200, 206 (Mo.App. E.D.2003).

Our review of the record reveals that CADCO was entitled to submit its fraudulent misrepresentation claim because sufficient evidence supported all elements of the claim, including Fleetwood's present intent to not grant CADCO an exclusive product territory at the time Fleetwood had represented it would grant CADCO an exclusive product territory. In support of its claim, CADCO introduced Exhibit 27, which was the 1998 Retailer Agreement containing the written addendum granting CADCO an exclusive product territory consisting of the St. Louis BTA, and the testimony of Dietz and several Fleetwood employees.

Dietz testified that Friedman represented that, in exchange for becoming a Fleetwood retailer, CADCO would have an exclusive product territory consisting of the St. Louis BTA and lasting five years. Dietz further testified that he believed Friedman had the authority to grant CADCO the exclusive product territory, he trusted Friedman, and he did not have any reason to believe Fleetwood would not stand behind Friedman's promises con-

cerning the exclusive product territory. Dietz testified that Friedman represented that only CADCO would be authorized to sell certain Fleetwood products, subject to specific, mutually-agreed upon exceptions. One such exception was Fleetwood's Crown Pointe model, which was to be sold in the St. Louis BTA by only CADCO and 21st Century Homes. Even though Coachman was authorized to sell the Sun Pointe model, Friedman assured Dietz that Crown Pointe and Sun Pointe were different. However, in July 2001, Fleetwood redesigned Crown Pointe and Sun Pointe so that the two models were virtually identical and allowed Coachman to sell the redesigned Sun Pointe model within the St. Louis BTA. Dietz testified that Fleetwood and CADCO did not mutually agree to the redesign or to Coachman's ability to sell the redesigned Sun Pointe model within CADCO's exclusive product territory. Dietz testified that he did not have actual knowledge of Fleetwood's plan to redesign Crown Pointe and Sun Pointe at the time CADCO agreed to carry the model in its exclusive product territory. However, based on his knowledge of Fleetwood's redesigns of other lines of mobile homes, Dietz concluded that Fleetwood could have planned to redesign Crown Pointe and Sun Pointe three to five years in advance of actually producing the redesigned Crown Pointe, which was prior to or concurrent with the time CADCO agreed to become a Fleetwood dealer. Dietz also testified the redesign destroyed CADCO's product protection with regard to Crown Pointe and essentially drove him out of business because the redesign resulted in buyers being able to purchase the same product, albeit under a different name, from other retailers within the St. Louis BTA who could stock and sell the product for less than CADCO.

Friedman testified via video deposition that he had completed, in his own hand-writing, the addendum to the 1998 Retailer Agreement granting CADCO an exclusive product territory consisting of the St. Louis BTA. Friedman also testified that, regardless of what was reflected in the addendum to the 1998 Retailer agreement, he had intended CADCO to have product protection only "in its own backyard," which he defined as "about a 15–mile radius from the specific point of distribution," but he had not intended to grant CADCO an exclusive product territory consisting of the entire St. Louis BTA, which was a "huge expanse."

Randy Kuhens, who was sales manager of Fleetwood's manufacturing plant in Benton, Kentucky, testified that Fleetwood never intended to give any retailer in the St. Louis BTA exclusive rights to sell mobile homes manufactured by the Benton plant. Kuhens testified Friedman was aware that no retailer in the St. Louis BTA could be offered an exclusive product territory. Kuhens also informed the jury that in the summer or fall of 1998, around the same time CADCO and Fleetwood entered into the 1998 Retailer Agreement, Fleetwood had no intention to give CADCO any exclusive product protection in the St. Louis BTA. Kuhens further testified, "The fact of the matter is no one retailer would ever have the entire St. Louis BTA as a protected market area." Two other Fleetwood employees, Larry Matthews, sales manager for two Tennessee manufacturing plants, and Ray Heck, retail marketing director and head of the St. Louis BTA coordinating team, also testified that Fleetwood did not intend to give CADCO an exclusive product territory for any of Fleetwood's products.

In the argument section of its brief, Fleetwood further asserts CADCO did not make a submissible case concerning its exclusive product territory with regard to Crown Pointe because CADCO failed to

show that Fleetwood represented it would not "redesign Crown Pointe to resemble some other product." We disagree. CADCO was required to show, and did show, that Fleetwood represented it would protect CADCO's ability to sell Crown Pointe within the St. Louis BTA and that Fleetwood did not intend to so protect CADCO's sales territory at the time of the parties' agreement, regardless of the method by which Fleetwood actually violated the agreement, i.e., failed to protect CADCO's sales territory by redesigning an exclusive model to be like a model sold by CADCO's competitor. Implicit in Fleetwood's representation that only CADCO would be able to sell Crown Pointe in the St. Louis BTA was the idea that only CADCO, subject to mutually agreed upon exceptions, would be able to sell a Fleetwood product in the St. Louis BTA with Crown Pointe's unique features. Fleetwood's unilateral decision to redesign Crown Pointe so it was nearly identical to Sun Pointe took away CADCO's ability to provide buyers with a unique product that CADCO's competitors in the St. Louis BTA could not provide.

Thus, as the record clearly shows, CADCO presented sufficient evidence from which the jury reasonably could have found that Fleetwood never intended to grant CADCO an exclusive product territory in which to sell certain Fleetwood products, including Crown Pointe, at the time Fleetwood represented that CADCO would have such a territory, thereby satisfying the element of "intent" for CADCO's fraudulent misrepresentation claim. Consequently, the trial court did not err in submitting to the jury the fraudulent misrepresentation claim contained in Instruction No. 7. Point denied.

### Negligent Misrepresentation

In its third point, Fleetwood argues the trial court erred in entering judgment for CADCO on its claim of negligent misrepresentation. Essentially, Fleetwood contends that even assuming, *arguendo*, it misrepresented CADCO would receive a right of first refusal to sell Meadowbrook when CADCO became a Pinnacle Retailer, CADCO presented no evidence from which the jury could find that CADCO was damaged by Fleetwood's refusal to grant CADCO that right of first refusal as Meadowbrook was not a "new" product in the St. Louis BTA since Fleetwood already was distributing Meadowbrook to Coachman when CADCO became a Pinnacle Retailer.

To establish a claim of negligent misrepresentation, a plaintiff must show: 1) the defendant supplied the plaintiff with information in the course of the defendant's business; 2) because of a failure of the defendant to exercise reasonable care or competence, the information was false; 3) the defendant intentionally provided the information for the guidance of a limited group, including the plaintiff, in a particular business transaction; and 4) the plaintiff suffered a pecuniary loss because of its reliance on the information. *Jim Lynch Cadillac, Inc. v. Nissan Motor Acceptance Corp.*, 896 S.W.2d 704, 707 (Mo. App. E.D.1995). While fraudulent misrepresentation requires proof that the defendant knew the statement was false or was reckless as to whether the statement was true or false, negligent misrepresentation requires only that the defendant failed to exercise reasonable care or competence to obtain or communicate true information. *Id.* Furthermore, "[o]ne who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if

he fails to exercise reasonable care or competence in obtaining or communicating the information." *Id.* at 708, *quoting* Restatement (Second) of Torts, Section 552(1) (1977).

 Our review of the record reveals that CADCO was entitled to submit its negligent misrepresentation claim because sufficient evidence supported all elements of the claim, including the element of damages. In support of its claim, CADCO introduced the testimony of Dietz, Frank Sprinkles (Sprinkles), manager of CADCO's sales center in Arnold, Tom Lister (Lister), manager of CADCO's sales center in Bonne Terre, and Brian Till (Till), an expert in marketing strategy, advertising, and consumer behavior.

Dietz testified that he and Friedman discussed CADCO's desire to sell only Fleetwood's mobile homes as a method of streamlining its operations. Dietz testified that becoming a Pinnacle Retailer meant CADCO would be required to liquidate all non-Fleetwood inventory, thereby "burning a bridge" with other manufacturers who previously had supplied CADCO with inventory. In light of making such a commitment to Fleetwood, Dietz valued the opportunity to refuse or to introduce any new Fleetwood products in the St. Louis BTA before other retailers could sell them. Moreover, the right of first refusal on Meadowbrook was very important to Dietz in making the decision to become a Pinnacle Retailer because the only Fleetwood products CADCO was carrying at the time were the "low-end" products. CADCO already had investigated Fleetwood's "high-end product ... and that left this hole in the middle[,]" which Meadowbrook, a mid-priced product, was meant to fill. Although Dietz knew Meadowbrook would not be available in the St. Louis BTA until the spring of 2000, Dietz agreed to become a Pinnacle Retailer in late December 1999

based on the representation that he would have the first opportunity to sell Meadowbrook at approximately the same time CADCO was liquidating the non-Fleetwood products. By the time Fleetwood informed Dietz of its decision not to allow CADCO the right of first refusal on Meadowbrook in 2000, CADCO was totally dependent on Fleetwood to supply it with inventory.

Sprinkles' and Lister's testimony corroborated Dietz's testimony. Both testified that their sales centers needed Meadowbrook to fill buyers' needs for a mid-priced product. Till testified that he had assessed the impact Fleetwood's behavior had on CADCO's ability to compete effectively. Till concluded that CADCO's lack of access to Meadowbrook hurt sales because CADCO needed a range of products to target different price segments of the market. Clearly, this testimony constituted sufficient evidence from which the jury reasonably could have found CADCO was damaged by Fleetwood's failure to honor the right of first refusal for Meadowbrook, which Fleetwood had represented CADCO would receive as a Pinnacle Retailer. Point denied.

### CADCO's Cross–Appeal

CADCO presents two points on cross-appeal. In its first point, CADCO claims the trial court erred in granting Fleetwood's motion for summary judgment on CADCO's contract claims contained in Counts I, II, III, and IV of CADCO's third amended petition because Fleetwood was not entitled to judgment as a matter of law. However, during oral argument, CADCO stated that, if the Court affirmed the misrepresentation (tort) verdict, CADCO would no longer pursue the contract claims. Given this admission, CADCO's first point on its cross-appeal is rendered moot.

In its second point, CADCO claims the trial court erred in granting Fleetwood's post-trial request for a $35,000 offset of the jury's verdict in favor of CADCO to account for the settlement between CAD-CO and Coachman. CADCO argues there was no legal basis for the offset because: 1) Fleetwood failed to plead "offset" as an affirmative defense, as required by Rule 55.08; and 2) Fleetwood failed to adduce evidence showing the damages CADCO suffered as a result of Coachman's conduct were the same as the damages CADCO suffered as a result of Fleetwood's conduct.

We review the trial court's grant of Fleetwood's request for an offset for abuse of discretion, which requires us to determine whether the trial court's grant of Fleetwood's request was so arbitrary and unreasonable as to indicate a lack of careful consideration. *See Hoover v. Brundage–Bone Concrete Pumping, Inc.,* 193 S.W.3d 867, 872 (Mo.App. S.D. 2006). An "offset" is a reduction in the plaintiff's claimed damages where the plaintiff enters into an agreement by a release or a covenant not to sue or not to enforce a judgment with one of two or more entities liable in tort for the same injury because such an agreement reduces the plaintiff's claim by the stipulated amount of the agreement. Section 537.060. Generally, a defendant must include "offset" in its pleadings as an affirmative defense prior to the start of trial. Rule 55.08; *Norman v. Wright,* 153 S.W.3d 305, 306 (Mo. banc 2005) (*Norman II*). The purpose of pleadings is to present, define, and isolate the issues so the trial court and all of the parties have notice of those issues. *Norman v. Wright,* 100 S.W.3d 783, 786 (Mo. banc 2003) (*Nor-*

*man I*). Accordingly, "[t]he relief awarded in a judgment is limited to that sought by the pleadings." *Id.*

Where the defendant fails to include "offset" as an affirmative defense, the defendant may amend its pleadings "only by leave of the trial court or by written consent of the adverse party [and] leave shall be given when justice so requires." Rule 55.33(a). However, where the defendant fails to include "offset" as an affirmative defense and does not request to amend its pleadings to include "offset," a post-trial motion for a reduction of the verdict under Section 537.060 should not be filed, considered, and ruled at any time after the entry of judgment. *Norman II,* 153 S.W.3d at 306 (*citing Norman I*).

In this case, on Friday, April 29, 2005, three days before trial began, CADCO and Coachman filed their joint Stipulation of Dismissal. The Stipulation of Dismissal acknowledged that CADCO had agreed to dismiss, with prejudice, its claims against Coachman and to pay its own costs and attorney's fees associated with those claims in return for a confidential settlement from Coachman.[4] The trial court immediately entered an order dismissing, with prejudice, Coachman from the case. On the following Monday, May 2, CADCO and Fleetwood proceeded to trial on only those claims CADCO had asserted against Fleetwood concerning misrepresentation. Fleetwood did not request to amend its pleadings to include "offset" either prior to or during trial. On May 19, the jury returned its verdict in favor of CADCO.

On May 31, 2005, nearly two weeks after the return of the jury's verdict but prior to the trial court's entry of final judgment,

---

**4.** The terms of the settlement agreement were not filed with this Court as part of the record on appeal.

CADCO and Fleetwood appeared at a post-trial hearing in chambers to discuss CADCO's settlement with Coachman. The following day, June 1, Fleetwood filed a letter with the trial court requesting that CADCO produce a copy of CADCO's settlement with Coachman. That same day, the trial court entered judgment, which included a $35,000 offset of the total damages awarded to CADCO to account for the settlement CADCO had received from Coachman.[5]

The record before us does not contain any indication that Fleetwood ever made a request or filed a motion, either before or after trial, proposing to amend its pleadings to include "offset" as an affirmative defense. Based on this record, it appears that Fleetwood merely asked for a reduction of the verdict after the jury rendered its verdict and before the trial court entered judgment. Because a reduction of the verdict under Section 537.060 must be pleaded and proved as an affirmative defense, Fleetwood was not entitled to an "offset." *Norman II*, 153 S.W.3d at 306; *Norman I*, 100 S.W.3d at 785.

But even if Fleetwood had proposed to amend its pleadings to include "offset," the trial court's reduction of the verdict to account for CADCO's settlement with Coachman was improper because the claim CADCO pursued at trial did not involve Coachman.

In its third amended petition, CADCO asserted two claims against Coachman: Count VI, which asserted that Coachman had tortiously interfered with CADCO's contractual relationship with Fleetwood; and Count VII, which asserted that Coachman and Fleetwood had committed civil conspiracy against CADCO by agreeing to take business away from CADCO and "to build up Coachman" so that Coachman would be the sole surviving Fleetwood retailer in the St. Louis BTA and would be suitably positioned for acquisition by Fleetwood. Only Count VII, the civil conspiracy claim, alleged that Coachman and Fleetwood were jointly and severally liable; Count VI, the tortious interference claim, alleged that Coachman was individually liable.

Prior to trial, the trial court dismissed Count VI and Count VII pursuant to CADCO's and Coachman's joint Stipulation of Dismissal. At trial, CADCO stated on the record that Coachman was no longer a defendant in the case. CADCO thereafter presented no evidence concerning the conspiracy claim, which was the only joint and several claim contained in CADCO's third amended petition. Count V, the sole claim CADCO actually presented to the jury, was only pled against Fleetwood for misrepresentation.

Thus, because Fleetwood failed to include "offset" as an affirmative defense and because CADCO only pursued a misrepresentation claim against Fleetwood at trial, Fleetwood was not entitled to offset the jury's verdict by any amount Coachman paid to CADCO in settlement of CADCO's claims against Coachman. Therefore, the trial court's grant of Fleetwood's request for an offset of the final judgment was improper. Point granted.

*Conclusion*

Fleetwood's three points on appeal are denied, and the trial court's judgment regarding those points is affirmed. CADCO's first point on cross-appeal is moot. CADCO's second point on cross-appeal is granted. Therefore, pursuant to Rule 84.14, we affirm the amended final judgment of the trial court but modify a por-

5. Later, on September 28, the trial court entered an amended final judgment awarding CADCO an additional $13,783.18 as taxable costs assessed against Fleetwood.

tion of the judgment by deleting the $35,000 offset, and enter judgment for CADCO in the amount of $1,735,352.18 which includes $13,783.18 previously assessed taxable costs.