In the

# United States Court of Appeals

## For the Seventh Circuit

Nos. 10-2052 & 10-2068

GARRY BOYD,
BOYD MEDICAL, INC.,
CHARLES WETHERILL,
and ADDISON MEDICAL, INC.,

*Plaintiffs-Appellees,*
*Cross-Appellants,*

*v.*

TORNIER, INC.,

*Defendant-Appellant,*
*Cross-Appellee.*

Appeals from the United States District Court
for the Southern District of Illinois.
No. 07 cv 751—**Donald G. Wilkerson**, *Magistrate Judge.*

ARGUED NOVEMBER 29, 2010—DECIDED AUGUST 24, 2011

Before BAUER, WOOD, and SYKES, *Circuit Judges.*

WOOD, *Circuit Judge.* Tornier is a manufacturer of medical goods related to joint replacement and soft tissue repair. It has distributors all over the United

States, including Boyd Medical, run by Garry Boyd, (collectively "Boyd") in Missouri and Addison Medical, run by Charles Wetherill, (collectively "Wetherill") in Iowa. Both Boyd and Wetherill had exclusive distributorship agreements with Tornier and relied heavily on that relationship for their financial health. Tornier, sadly for them, had other ideas and terminated its agreements with each one. As with many breakups, somebody got hurt. This time it was Boyd and Wetherill, both of whom were forced to shut down their businesses. Soon after, they sued Tornier for breach of contract, intentional misrepresentation, and negligent misrepresentation. Additionally, both asked for punitive damages on the intentional misrepresentation claims.

The district court dismissed Wetherill's negligent misrepresentation claim at summary judgment but allowed the other claims to proceed to trial. The jury returned a verdict against Tornier on all of the remaining claims, awarding both actual and punitive damages to both plaintiffs. The magistrate judge, presiding by the consent of the parties under 28 U.S.C. § 636(c), set aside the punitive damages awards, finding that the evidence did not support the jury's decision. The court then entered judgment for each distributor's actual damages. This appeal and cross-appeal followed. Tornier argues that the contract expressly precludes the award of lost profits for the breach of contract; that the plaintiffs' intentional and negligent misrepresentation claims fail as a matter of law and fact; and that the damages awards on the tort claims were not adequately sup-

ported by the evidence. Boyd and Wetherill counter that the punitive damages awards should be reinstated.

We conclude that each side must win something and lose something. We vacate the awards for the plaintiffs of lost profits on their breach of contract action. We affirm the verdicts against Tornier on intentional misrepresentation and negligent misrepresentation, but we vacate the jury's awards of actual damages, as they were supported by insufficient evidence. Finally, we affirm the court's decision to set aside the punitive damages awards. We thus remand the case to the district court for a recalculation of damages consistent with this opinion.

## I

In 2003, Tornier entered into exclusive distributorship agreements with Boyd and with Wetherill. Each agreement specified that the local agent was to be the only authorized seller of Tornier products in its designated regions. The agreements also demanded exclusivity for Tornier: each distributor was restricted from selling products that competed with Tornier products. As an added layer of contractual protection, Tornier had the right to set sales quotas for Boyd and Wetherill; if the distributor did not meet the quotas, Tornier could terminate the agreement. These arrangements were confined to Tornier's product markets; Boyd and Wetherill were still free to sell non-competing, non-Tornier products. The agreements included a Texas choice-of-law clause.

In truth, Tornier was not necessarily committed to its existing model of exclusive distributors. At the same

time as it was signing these agreements, it was crafting alternative plans for its future expansion and growth. One of Tornier's ideas was to "capture" the distributors so that they were selling only Tornier products. This meant that Tornier needed to persuade its distributors to drop the non-competing non-Tornier products and become dedicated Tornier outlets. To this end, Tornier told Boyd and Wetherill that it was going to acquire some bigger and better products and give them exclusive distribution rights in a solid long-lasting relationship. At one point Tornier told Boyd that if Boyd dropped the non-Tornier products, he would be Tornier's "guy in St. Louis." To Wetherill, Tornier similarly promised that he was the "chosen one" in Iowa. Tornier also promised Wetherill that Wetherill would get exclusive distribution rights to Nexa, a popular orthopedic brand that Tornier was soon going to acquire. Buoyed by these lofty promises, Boyd and Wetherill each began to prepare for their future with Tornier, by dropping some of their other products and concentrating on Tornier's.

But all was not as it seemed: Tornier was in fact not pleased with either Boyd or Wetherill. Tornier had decided internally that Boyd and Wetherill did not fit the new business model it had devised for itself. Indeed, it had already positioned alternative distributors to take over for them. Tornier then hiked Boyd's and Wetherill's 2007 quotas to an unreasonable level—for Boyd, 56% higher than the previous year, and for Wetherill, 82% higher than the previous year. When Boyd and Wetherill could not meet those expectations, Tornier cut them from the team and brought in their replacements. By that

time, Boyd and Wetherill had become financially depend-ent on their relationships with Tornier and consequently went out of business.

Boyd and Wetherill then sued Tornier for breach of contract, intentional misrepresentation, and negligent misrepresentation. In addition, they asked for punitive damages in connection with their intentional misrep-resentation theories. Invoking diversity jurisdiction, see 28 U.S.C. § 1332, they brought their action in the federal court in the Southern District of Illinois. Tornier is a Delaware corporation with its principal place of business in Minnesota; Boyd and his company are citizens of Missouri, and Wetherill and his company are citizens of Iowa. Boyd's tort claims are governed by Missouri law and Wetherill's by Iowa law. The breach-of-contract claims are governed by Texas law, as stipulated in the agreements' choice-of-law clauses.

At summary judgment, the district court allowed the breach-of-contract claims to proceed based on Tornier's unreasonable hiking of Boyd's and Wetherill's sales quotas. It allowed the intentional misrepresentation claims to go forward based on Tornier's allegedly mis-leading statements telling Boyd and Wetherill to drop other product lines to ensure a promising relationship with Tornier and promising Wetherill that Tornier would grant him the distribution rights to the Nexa brand. Finally, with regard to the negligent misrepre-sentation counts (which were predicated on the same statements as the intentional misrepresentation charges), the district court allowed Boyd's claim to proceed, but

it dismissed Wetherill's claims because Iowa law limits such claims to attorneys, accountants, and other professionals in the business of guiding others in their affairs. At trial, the jury returned a verdict against Tornier on all of the claims that had survived summary judgment, awarding $1,491,000 in actual damages for Boyd and $1,100,000 in actual damages for Wetherill. The jury also gave Boyd and Wetherill $2 million each in punitive damages. In response to Tornier's post-trial motions under Federal Rules of Civil Procedure 50(b) and 59(e), the magistrate judge upheld the jury verdicts on the misrepresentation claims, set aside the punitive damages, and entered judgment for the actual damages. All parties timely appealed.

## II

### A

We begin by discussing Tornier's argument that the court erred when it upheld the jury's award of lost profits for each plaintiff's breach of contract claims. We review the denial of Tornier's motion to alter the judgment for abuse of discretion, noting that for relief under Rule 59(e) the movant must demonstrate a manifest error of law or fact or present newly discovered evidence. FED. R. CIV. P. 59(e); *Kapelanski v. Johnson*, 390 F.3d 525, 530 (7th Cir. 2004); *County of McHenry v. Insurance Co. of the West*, 438 F.3d 813, 819 (7th Cir. 2006).

The Tornier Agency Agreement signed by both plaintiffs addressed the subject of lost profits in a manner that

is not helpful to the plaintiffs. Article 9.6, which was identical in the two agreements, says, "Upon termination of this Agreement, neither party shall be liable to the other for any loss of profits of any kind or nature sustained or arising out of such termination." Despite this language, the court upheld the jury's decision to award one year's lost profits for both Boyd and Wetherill. In so doing, it relied on a principle of Texas law to the effect that a contractual limitation on damages may not be enforced when a disparity of bargaining power exists—*i.e.*, when one party has no real choice in accepting the agreement limiting the liability of the other party. *Federated Dep't Stores, Inc. v. Houston Lighting & Power Co.*, 646 S.W.2d 509, 511-12 (Tex. App. 1982). The court reasoned that the question whether this kind of imbalance of power existed was one of fact and thus for the jury. See *id.* (stating that the existence of this disparity is a question of fact). The jury in turn found the necessary disparity. We conclude, to the contrary, that on this record the jury should never have been asked to make this determination.

Boyd and Wetherill point to little that indicates a substantial disparity in bargaining power. They state that they were both dependent on Tornier's business and that they had been unable to negotiate contractual terms before, but if that is enough to meet the Texas rule, then the state might as well have outlawed the topic of damage limitations for private orderings—and it has not done so. Neither of these statements tells us much about the bargaining dynamic. The mere fact that Tornier was firm in negotiation does not indicate substantially

unequal bargaining power. Moreover, Boyd and Wetherill were both selling non-Tornier products. It may be that over time they became dependent on Tornier, but both were sophisticated businesses and their resulting financial dependence was the product of their choices. They protest that they were fraudulently manipulated by Tornier and thus any apparent element of choice was illusory, but that is a different point. There is no necessary correlation between disparity in size and ability of one party to defraud another. We recognize that, in the appropriate case, fraudulent statements may vitiate a contracting party's real choice and alter the party's access to information, and in that way create some kind of power disparity. But we do not think that this is such a case. As we will see below, Boyd and Wetherill were led astray, much to their detriment, by Tornier's falsehoods, and for this they will receive compensation. At the same time, they were successful distributors, with access to Tornier's competitors and other similarly situated companies. They had the choice of rejecting Tornier's demands, of driving a harder bargain, or of diversifying their own businesses in a way that preserved Tornier's exclusivity in the medical devices market. They chose instead to accept Tornier's terms, and, at least for purposes of their contract theories, that is the contract with which they must contend.

There is little else to say about the award of lost-profits damages. Article 9.6 specifically excludes this form of relief. Neither plaintiff has offered any other reason why its lost-profit award does not fall within the scope of

that article. We therefore conclude that these damages must be set aside.

B

We turn now to Tornier's arguments that the the plaintiffs' misrepresentation claims should have been rejected both on the law and as a matter of fact. We review the court's denial of Tornier's post-trial motion for judgment as a matter of law *de novo*, viewing the evidence in the light most favorable to the nonmoving parties, Boyd and Wetherill. *Liu v. Price Waterhouse LLP*, 302 F.3d 749, 754 (7th Cir. 2002). If any reasonable jury could have reached the same conclusion, then the motion was properly denied. *Id.*

Under both Missouri and Iowa law, to establish a claim of intentional misrepresentation, one must show: (1) there was a false, material representation; (2) the speaker knew of its falsity; (3) the speaker intended to deceive; (4) the hearer justifiably relied on the representation being true; and (5) damages. *Murray v. Crank*, 945 S.W.2d 28, 31 (Mo. App. 1997); *City of McGregor v. Janett*, 546 N.W.2d 616, 619 (Iowa 1996). The jury found that Tornier made three intentional misrepresentations—one to Boyd and two to Wetherill. The first occurred when Tornier told Boyd that if he dropped other non-Tornier product lines that Boyd was carrying, he could look forward to a long, productive relationship with Tornier; the second involved the same promise to Wetherill; and the third was Tornier's promise to give Wetherill an exclusive distributorship for the

Nexa product line. Tornier argues that these findings must be rejected because Boyd and Wetherill have failed to establish two essential elements: justifiable reliance on the part of Boyd and Wetherill, and Tornier's knowledge that the statements were false.

Tornier first argues that Boyd and Wetherill took no action in reliance on the statements. Though Boyd and Wetherill both dropped other non-Tornier product lines, Tornier asserts that they did so for reasons unrelated to the alleged misrepresentations. But there was evidence to the contrary in the record. Garry Boyd testified that after Tornier had made its promises to him he dropped the Alphatech and Exactech product lines, both non-Tornier products, in order to focus on the Tornier brands. Similarly, Charles Wetherill testified that he dropped the Exactech product line and did not pursue opportunities with two other companies, Integra LifeSciences and Depuy Orthopaedics, in reliance on Tornier's promises. Furthermore, Wetherill hired a salesman to focus on Nexa sales. A reasonable jury could have found that these facts established justifiable reliance.

Tornier responds that even if Boyd and Wetherill relied on its promises, they did so unjustifiably. Tornier asserts that its representations to Boyd and Wetherill were expressly conditional: it said only that if they dropped *all* other non-Tornier product lines, there would be a long, stable relationship awaiting them. Since neither Boyd nor Wetherill dropped all of their non-Tornier product lines, neither fulfilled the condition of the promise. Thus, there was no *justifiable* reliance.

Unfortunately for Tornier, the evidence does not support this story. Boyd testified that he was told that he should "[f]ocus on Tornier," in exchange for the promised benefits. Similarly, Wetherill testified that he was supposed to "envision what [Tornier's] business plan was" and drop lines that may compete. Nothing in either Boyd's or Wetherill's testimony indicates that they were required to drop every single non-Tornier line in order to qualify for a long-term relationship with Tornier. A reasonable jury could have credited Boyd's and Wetherill's account of the scope of the commitment Tornier was seeking and thus conclude that both Boyd and Wetherill justifiably relied on Tornier's promises when they dropped some non-Tornier brands and forewent other opportunities.

Tornier also argues that the evidence is not sufficient to permit the jury to find that Tornier knew at the time it made its promises that they were false. All of the evidence, it asserts, is equally consistent with good-faith promises, subsequently changed plans, and thus at most a failure to perform in accordance with those promises. In response, Boyd and Wetherill point to the fact that at the same time it was talking to them, Tornier was quietly positioning alternative distributors in their regions. Even more telling was the evidence showing that Tornier insiders had discussed Boyd's and Wetherill's lack of "fit" with its business model before the misrepresentations were made. This provides sufficient, maybe even compelling, reason for finding that Tornier knew at the time it spoke that the promises were false, as it indicates that Tornier had no intention

of pursuing a long-term relationship with either Boyd or Wetherill. Tornier protests that, as part of its business strategy, it had set up substitutes for all of its distributors, not only Boyd and Wetherill. This does little to persuade. If it was behaving duplicitously with the other distributors, then it sounds like an assertion that lots of lies are better than a few. If it was not leading the others on, then its plans for them are immaterial. In light of the evidence presented in this case, a reasonable jury could have rejected Tornier's explanation and found instead that Tornier knew its promises were false. In short, we conclude that there was sufficient evidence to affirm the jury's verdicts against Tornier on all three intentional misrepresentation claims.

The jury also found for Boyd on the theory of negligent misrepresentation based once again on Tornier's promise of a future close relationship. In Missouri, "[t]he elements of negligent misrepresentation are: (1) the speaker supplied information in the course of his business; (2) because of the speaker's failure to exercise reasonable care, the information was false; (3) the information was intentionally provided by the speaker for the guidance of limited persons in a particular business transaction; (4) the hearer justifiably relied on the information; and (5) due to the hearer's reliance on the information, the hearer suffered a pecuniary loss." *Renaissance Leasing, LLC v. Vermeer Mfg. Co.*, 322 S.W.3d 112, 134 (Mo. 2010). " '[O]ne who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business trans-

actions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.' " *CADCO, Inc. v. Fleetwood Enters., Inc.*, 220 S.W.3d 426, 438-39 (Mo. App. 2007) (quoting RESTATEMENT (Second) OF TORTS, § 552(1) (1977)).

Tornier argues that implicit in the first element is a limitation of this tort to attorneys, accountants, and other professionals whose business it is to give others guidance in their affairs. Tornier is not involved in the business of providing guidance to people in their business pursuits—it manufactures medical devices. Thus, Tornier argues, it cannot be liable for negligent misrepresentation. Tornier acknowledges that no Missouri court has so ruled; nevertheless, Tornier invites us to take that step. Other states have done so, it points out; indeed, it was for this reason that Iowa law barred Wetherill's negligent misrepresentation claim.

Federal courts are not in a position to innovate when state law provides the rule of decision. Although it is certainly possible that Missouri some day might want to follow states like Iowa, we conclude that it has not yet done so. The Missouri courts, adopting the Restatement's view, state that one "who, in the course of his business, profession or employment, or *in any other transaction in which he has a pecuniary interest*" may be liable for negligent misrepresentation. Even though Tornier is not in the business of providing guidance, its negligent misrepresentation was part of a transaction in which it

had a pecuniary interest. That is enough, under the Missouri cases we have found; they do not require the defendant to be in the business of giving guidance to others. For example, in *CADCO, Inc.*, a Missouri appellate court upheld a verdict finding a mobile home manufacturer guilty of negligent misrepresentation in its transaction with a dealer. 220 S.W.3d at 439. The manufacturer told the dealer that it would be allowed to sell a particular model and then reneged. *Id.* Though the appeal in *CADCO, Inc.* primarily concerned damages, the court found that all the elements of the tort had been met. *Id.* Since Missouri takes a broader view of negligent misrepresentation than Tornier suggests, and the evidence supported the jury's conclusion in favor of Boyd, we reject Tornier's effort to set aside this part of the verdict.

## C

Finally, we reach the topic of tort damages, about which both sides have something to say. Tornier asserts that the award of actual damages was not supported by sufficient evidence. As this was part of Tornier's Rule 59(e) motion to alter the judgment that the district court denied, our review is once again only for abuse of discretion. The jury's awards of actual damages for the plaintiffs included lost profits for six years and assumed a growth rate of 20% per year for both Boyd and Wetherill. Tornier argues that the awards should be limited to one year's lost profits, as the distributorship contracts were only for one-year terms. In addition, it argues that even if the awards in theory can go beyond

one year, the evidence here of actual damages did not support such an extension.

Both Missouri and Iowa allow lost profit damages in tort to exceed the term of the contract if the misrepresentation included promises of an ongoing, lasting relationship. *Jacobs Mfg. Co. v. Sam Brown Co.*, 19 F.3d 1259, 1264 (8th Cir. 1994) (applying Missouri law); *Robinson v. Perpetual Servs. Corp.*, 412 N.W.2d 562, 566-67 (Iowa 1987). As we have already established, the jury here was entitled to conclude that Tornier fraudulently promised Boyd and Wetherill an ongoing, lasting relationship. In principle, therefore, Boyd and Wetherill could recover beyond the one-year terms of their contracts.

Nevertheless, any such damages would have had to find support in the evidence. A plaintiff cannot recover for damages that are speculative or uncertain. Though a plaintiff will not be denied recovery merely because the amount of damages is difficult to ascertain, there must be a reasonable basis in the record from which the amount of damages can be inferred or approximated. *Coonis v. Rogers*, 429 S.W.2d 709, 714 (Mo. 1968); *Robinson*, 412 N.W.2d at 567.

No such reasonable basis is present here. The assumption that Boyd and Wetherill would sustain 20% annual growth for six consecutive years was buttressed by little more than conjecture and hope. Boyd and Wetherill offered as evidence their own testimony and the testimony of expert witness John Kaelblein. Wetherill testified that the basis for his 20%-growth assumption was that this was the industry standard. Boyd echoed

this view on the industry's standard growth and added that his company would grow by 20% as that was his commission percentage. But the latter point about his commission says nothing about his company's growth. There is no obvious correlation between growth and commission percentage. Indeed, one might cultivate a company's growth by taking a smaller commission and reinvesting in the company; conversely, one could inhibit growth by gobbling up profits through a high commission that depletes the company's financial resources. As for Boyd's and Wetherill's speculation about standard growth in the industry, the testimony of their own expert contradicted their assertions. At the trial held in 2009, Kaelblein testified that he thought that all medical companies would grow at significantly less than 20% for three years and that 20% growth was not sustainable, especially given the then-sluggish state of the economy. This is simply not enough evidence to support a jury finding that the plaintiffs' businesses would have grown at a steady rate of 20% per year for six years.

In addition to the actual damages, the jury awarded Boyd and Wetherill $2 million each in punitive damages. In the district court, Tornier argued that there was no evidentiary basis for the awards and moved to set them aside. The magistrate judge agreed and granted Tornier's motion for judgment as a matter of law on the requests for punitive damages. In their cross-appeal, Boyd and Wetherill challenge this determination; they insist that Tornier's conduct was reckless with respect to the grave financial consequences they ultimately suf-

fered, and this was enough to show legal malice. Our review is under the familiar *de novo* standard, viewing the evidence most favorably to nonmovants Boyd and Wetherill. *Medcom Holding Co. v. Baxter Travenol Labs., Inc.*, 106 F.3d 1388, 1402 (7th Cir. 1997).

Punitive damages may be awarded only upon a showing of outrageous conduct that demonstrates actual or legal malice. *Jefferson v. American Fin. Group, Inc.*, 163 S.W.3d 485, 488 (Mo. App. 2005); *Peters v. General Motors Corp.*, 200 S.W.3d 1, 24 (Mo. App. 2006); *Van Sickle Const. Co. v. Wachovia Commercial Mortgage, Inc.*, 783 N.W.2d 684, 689 (Iowa 2010). Actual malice may be shown by spite, hatred, ill will, or vindictive motives. *Van Sickle Const. Co.*, 783 N.W.2d at 689-90; *Bramon v. U-Haul, Inc.*, 945 S.W.2d 676, 684 (Mo. App. 1997). Legal malice may be shown by reckless indifference for an act's consequences. *Oster v. Kribs Ford, Inc.*, 660 S.W.2d 348, 355 (Mo. App. 1983); *Van Sickle Const. Co.*, 783 N.W.2d at 690. These standards are not to be taken lightly: punitive damages are an extraordinary measure, to be applied sparingly. *Artilla Cove Resort, Inc. v. Hartley*, 72 S.W.3d 291, 296 (Mo. App. 2002). Merely objectionable conduct is insufficient to sustain a punitive damages award. *Wolf v. Wolf*, 690 N.W.2d 887, 893 (Iowa 2005).

The district court correctly ruled that this record did not support punitive damages against Tornier. Tornier engaged in tortious behavior, but there was no evidence that its behavior was with any kind of malice—actual or legal. Nothing indicates that Tornier bore ill will or hatred towards them, nor does the evidence show legal

malice. Tornier engaged in a fraudulent business strategy with sophisticated business partners. It may have realized that Boyd and Wetherill could be affected financially by its misrepresentations, but it was acting in the business arena with parties that were capable of protecting themselves. This falls short of reckless indifference. Moreover, though tortious and objectionable, Tornier's conduct was not outrageous. Bad consequences resulted for Boyd and Wetherill, and they will be compensated for their losses. Punitive damages, however, would both over compensate Boyd and Wetherill and unnecessarily punish Tornier. We thus affirm the district court's decision to set aside the punitive damages awards.

*   *   *

We VACATE the award of lost profits on the breach of contract action. We AFFIRM the verdicts against Tornier on intentional misrepresentation and negligent misrepresentation, but we VACATE the jury's award of actual damages. Finally, we AFFIRM the order setting aside the punitive damages awards. The case is REMANDED to the district court for a recalculation of damages consistent with this opinion. Each side is to bear its own costs.