**8000 MARYLAND, LLC,**
**Plaintiff/Respondent,**

v.

**HUNTLEIGH FINANCIAL SERVICES INC., and Longrow Holdings, Inc., Defendants/Appellants,**

and

**Huntleigh Capital Management, Inc., HFI Securities, Inc., Longrow Insurance Agency, Inc., Moses.com Securities, Inc., James A. Winkelmann, and Don C. Weir, Defendants.**

**8000 Maryland, LLC,**
**Plaintiff/Appellant,**

v.

**Huntleigh Financial Services Inc., Longrow Holdings, Inc., Huntleigh Capital Management, Inc., HFI Securities, Inc., Longrow Insurance Agency, Inc., Moses.com Securities, Inc., Defendants,**

and

**James A. Winkelmann, and Don C. Weir, Defendants/Respondents.**

**Nos. ED 91382, ED 91633, ED 91634.**

Missouri Court of Appeals,
Eastern District,
Division Four.

July 21, 2009.

Motion for Rehearing and/or Transfer to Supreme Court Denied Sept. 1, 2009.

---

Application for Transfer Denied
Oct. 6, 2009.

Paul N. Rechenberg, Chesterfield, MO, for plaintiff/respondent/cross-appellant.

Robert D. Blitz, R. Thomas Avery, Douglas A. Stockenberg, Blitz, Bardgett & Deutsch, L.C., St. Louis, MO, for defendants/appellants/cross-respondents.

KATHIANNE KNAUP CRANE, Presiding Judge.

Plaintiff, the owner and lessor of an office building, filed a lawsuit seeking relief from its tenant, its tenant's parent, and its tenant's subsidiaries under the Missouri Uniform Fraudulent Transfer Act (MUFTA), sections 428.005 to 428.059 RSMo (2000)[1], claiming that its tenant, by means of a stock sale, had transferred its assets for inadequate consideration to the tenant's parent, which rendered tenant unable to pay its indebtedness to plaintiff.[2] It also sought relief from the same parties and two individuals for civil conspiracy. The trial court found a wrongful transfer, set aside the transfer as void, and awarded plaintiff $2,000,000 in damages against the tenant's parent and $79,760.50 in attorney's fees against the tenant and its parent. The trial court entered judgment in favor of the individual defendants on plaintiff's civil conspiracy claim.

The tenant and its parent appeal. They primarily challenge the admissibility of plaintiff's expert's testimony on the value of the transferred assets. They contend that if the expert's testimony was inadmissible, then the trial court's findings and the damages awarded to plaintiff were not supported by substantial evidence. They further claim that the trial court gave plaintiff a double recovery. Plaintiff also appeals. It challenges the denial of its civil conspiracy claim against the individual defendants. We have consolidated these appeals and affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

We begin our chronology in December 2001. At that time plaintiff, 8000 Maryland, LLC, was the owner and lessor of an office building at 8000 Maryland Avenue, in Clayton, Missouri. Defendant, Huntleigh Financial Services, Inc., (HFS) was the lessee of office space in that building under a 1997 lease.

HFS was owned by defendant, Longrow Holdings, Inc. The individual defendants, James A. Winkelmann and Don C. Weir, Jr., owned Longrow. HFS owned four subsidiaries, which are also defendants: Huntleigh Capital Management, Inc.; HFI

---

1. All further statutory references are to RSMo (2000) unless otherwise indicated.

2. MUFTA makes the following transfers fraudulent as to present and future creditors:

 1. A transfer or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:

 (1) With actual intent to hinder, delay, or defraud any creditor of the debtor; or

 (2) Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor;

 (a) Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or

 (b) Intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due.

 Section 428.024.1.

Securities, Inc.; Longrow Insurance Agency, Inc.; and Moses.com Securities, Inc. (Moses.com) (the subsidiaries). Mr. Weir and Mr. Winkelmann were officers and directors of each of these corporations.

HFS subleased approximately 95% of its leased space in the building to Huntleigh Securities Corporation (Huntleigh Securities), which was not owned by defendants. The remaining leased space was utilized by all of the defendants.

The subsidiaries made monthly payments to HFS in the form of management fees. These management fees were used by HFS to pay for technology-related expenses, employee expenses, and research. HFS paid a portion of the fees to Longrow, which Longrow used to pay the salaries of Mr. Weir and Mr. Winkelmann, as well as its debts. In addition, HFS used a portion of the fees, as well as the sublease payments from Huntleigh Securities, to make its lease payments to plaintiff.

In December 2001, Huntleigh Securities notified HFS that it was exercising its termination clause and would be moving out in June 2002. Subsequently, Mr. Winkelmann informed plaintiff that HFS was having financial problems that were affecting its ability to pay rent. On July 26, 2002, plaintiff sent Mr. Winkelmann a letter informing him that it would exercise its rights and remedies under the lease in the event HFS defaulted in the payment of rent.

On August 15, 2002, HFS sold all of its interest in the subsidiaries to Longrow by means of a written Stock Purchase Agreement. In exchange, Longrow issued an interest-bearing promissory note in the amount of $118,995 to HFS. This amount, which was based on the value of the physical assets owned by the subsidiaries, was set by Mr. Winkelmann. After the stock transfer, the subsidiaries continued to make monthly payments of management fees; however, they paid those fees to Longrow.

Also in August 2002, HFS stopped making lease payments to plaintiff, and plaintiff filed a lawsuit against HFS for breach of lease to recover the amount of rent due under the lease.[3] The lawsuit resulted in a settlement. In July 2006, HFS signed a consent judgment in plaintiff's favor in the amount of $2,200,000, which represented the amount HFS owed to plaintiff under the lease. Plaintiff was unable to collect on the consent judgment. As a result, plaintiff filed this lawsuit in August 2006.

Plaintiff's petition was framed in six counts, two of which are relevant to this appeal. Count I was directed to the corporate defendants only and sought relief under MUFTA for the fraudulent conveyance of the subsidiaries to Longrow. Count III sought to hold all defendants, including the individual defendants, jointly and severally liable on a theory of civil conspiracy. The individual defendants raised as one of their affirmative defenses that they were acting at all times solely in their respective capacities as officers and directors of Longrow, HFS, and the subsidiaries.

After a bench trial, the trial court entered its Findings of Fact, Conclusions, and Judgment finding that the subsidiaries had been wrongfully transferred and setting aside the transfer as void. It left the remaining issues open for future determination. After a second hearing, the trial court entered its Findings of Fact, Conclusions, and Amended Final Judgment. It again set aside the stock sale as void, and it entered judgment against Longrow in the amount of $2,000,000, which amount it found to be the minimum value of the

3. HFS vacated the leased space in September 2002.

assets transferred. The trial court concluded that the judgment against Longrow was derivative of the underlying consent judgment against HFS and that any sums received by plaintiff should be credited toward the consent judgment. It also entered judgment against HFS and Longrow for plaintiff's attorney's fees in the amount of $79,760.50. The trial court subsequently entered its Second Amended Findings of Fact, Conclusions, and Final Judgment in which the trial court concluded that it was not necessary to enter judgment against any defendant other than HFS and Longrow.

Plaintiff responded to the second amended judgment with two motions to amend the judgment. One of the grounds raised was that the trial court did not rule on plaintiff's civil conspiracy claim directed at Mr. Weir and Mr. Winkelmann. The trial court thereafter entered its Third Amended Final Judgment, which incorporated its prior findings, and concluded that plaintiff had failed to prove its remaining claims, which included its claim against Mr. Winkelmann and Mr. Weir based on civil conspiracy.

## DISCUSSION

*Standard of Review*

■ On appeal from a court-tried case, we will affirm the trial court's judgment unless there is no substantial evidence to support it, it is against the weight of the evidence, or it erroneously declares or applies the law. *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976). We accept all evidence and inferences therefrom in the light most favorable to the judgment, and we disregard all contrary evidence. *Sheppard v. East*, 192 S.W.3d 518, 522 (Mo.App.2006). We defer to the

trial court on factual issues " 'because it is in a better position not only to judge the credibility of witnesses and the persons directly, but also their sincerity and character and other trial intangibles which may not be completely revealed by the record.' " *Essex Contracting, Inc. v. Jefferson County*, 277 S.W.3d 647, 652 (Mo. banc 2009) (quoting *In re Adoption of W.B.L.*, 681 S.W.2d 452, 455 (Mo. banc 1984)). In determining the credibility of the witnesses and the weight to be given to their testimony, a trial court is free to believe all, part, or none of the testimony of any witness. *Missouri Land Dev. Spec. v. Concord Exca.*, 269 S.W.3d 489, 496 (Mo. App.2008).

■ Rule 84.04(e) limits the argument portion of a brief to those claims of error that appear in a point relied on. *See Hutchings ex rel. Hutchings v. Roling*, 193 S.W.3d 334, 346 (Mo.App.2006). As a result, our review is likewise limited to those errors. *Hutchings*, 193 S.W.3d at 346. We do not consider grounds for reversal that appear solely in the argument portion of the brief. *Id.*; *Russ v. Russ*, 39 S.W.3d 895, 899 n. 5 (Mo.App.2001). Conversely, we deem abandoned any issues identified in the point relied on that are not supported by argument in the argument portion of the brief. *Luft v. Schoenhoff*, 935 S.W.2d 685, 687 (Mo.App.1996). Therefore, if an argument is narrower than a point relied on, our review is limited to that argument.

## DEFENDANTS' APPEAL[4]

Defendants raise four points on appeal. Their first point challenges the admissibility of plaintiff's expert's testimony. Their second and fourth points assert that, if the expert testimony was not admissible, the

4. The notice of appeal was filed on behalf of HFS and Longrow. The word "defendants" is used in this section of the opinion to refer to these two defendants collectively.

trial court's findings and the amount of the money judgment were not supported by substantial evidence. In their third point they contend that the trial court improperly allowed plaintiff a double recovery. We will consider these points in the order set out in this paragraph.

*Preservation of Error*

■ As a preliminary matter, we consider plaintiff's preservation of error claim. Plaintiff asserts that defendants failed to preserve any error for review because they failed to file a motion to amend the trial court's judgment pursuant to Rule 78.07(c). We disagree. Rule 78.07(c) requires "allegations of error relating to the form or language of the judgment" in a court-tried case to be raised in a motion to amend in order to preserve that error for appellate review. None of defendants' points on appeal challenge the form or language of the judgment. Instead, they challenge the admissibility of expert testimony, the sufficiency of the evidence without that testimony, and whether the judgment improperly allowed plaintiff a double recovery. These are not the types of errors that must be raised in a motion to amend the judgment in order to preserve these issues for appeal.

### I. *Admissibility of Plaintiff's Expert's Testimony*

For their first point, defendants assert that the trial court erred in admitting the testimony of plaintiff's expert witness, Donna Beck Smith, CPA, to the value of the transferred assets because her testimony did not comply with section 490.065.3 in that the facts and data she relied on were not the type "reasonably relied upon by experts in the field" or "otherwise reasonably reliable." In their argument under this point, defendants explain that her opinion was not reliable because she did not conduct a full valuation of the subsidiaries and because she relied on the existence of hypothetical non-compete agreements. Neither argument has merit.

Section 490.065 sets out when and in what form expert testimony is admissible. Section 490.065.3 allows an expert to base an opinion or inference on facts and data "perceived by or made known by him at or before the hearing." However, it requires the facts and data on which an expert bases an opinion to be "of a type reasonably relied upon by experts in the field forming opinions and inferences upon the subject and must otherwise be reasonably reliable." *Id.*

■ The determination whether to admit or exclude expert testimony is within the sound discretion of the trial court. *McGuire v. Seltsam*, 138 S.W.3d 718, 720 (Mo. banc 2004). Likewise, the determination whether the testimony satisfies section 490.065 is within the trial court's sound discretion. *Id.*[5] We will not find an abuse of discretion unless the ruling is clearly against the logic of the circumstances then before the court and is so arbitrary and unreasonable that it shocks the sense of justice and indicates a lack of careful consideration. *Id.*

■ The facts or data on which an expert relies do not need to be independently admissible if the evidence satisfies the two requirements of section 460.065.3. *CADCO, Inc. v. Fleetwood Enterprises,*

---

5. Defendants argue that this issue is a question of law, which we should review *de novo*, citing *Thomas v. Festival Foods*, 202 S.W.3d 625, 627 (Mo.App.2006); *Vittengl v. Fox*, 967 S.W.2d 269, 280 (Mo.App.1998); and *Stan Cushing Const. v. Cablephone, Inc.*, 816 S.W.2d 293, 296 (Mo.App.1991). The decision of the Missouri Supreme Court as expressed in *McGuire*, 138 S.W.3d at 720, stating that we review this issue for abuse of discretion, is controlling.

*Inc.*, 220 S.W.3d 426, 434 (Mo.App.2007). First, a trial court must determine whether the facts and data are of a kind reasonably relied upon by experts in the field. *Id.* In making this determination, trial courts are generally expected to defer to the expert's assessment of what facts or data are reasonably reliable in the field. *Id.* (citing *Goddard v. State*, 144 S.W.3d 848, 854 (Mo.App.2004)). *See also Doe v. McFarlane*, 207 S.W.3d 52, 62 (Mo.App. 2006). The second requirement of section 490.065.3 requires a trial judge to ensure that the facts and data relied upon by the expert are otherwise reasonably reliable. *CADCO, Inc.*, 220 S.W.3d at 434. "It is only in those cases where the source upon which the expert relies for opinion is so slight as to be fundamentally unsupported, that the finder of fact may not receive the opinion." *Keyser v. Keyser*, 81 S.W.3d 164, 169 (Mo.App.2002). *See also Doe*, 207 S.W.3d at 62; *Scott v. Blue Springs Ford Sales, Inc.*, 215 S.W.3d 145, 176 (Mo.App. 2006). "If the facts and data are shown to be reasonably relied upon by experts in the field, they are necessarily relevant to the issue the expert is addressing." *Murrell v. State*, 215 S.W.3d 96, 112 (Mo. banc 2007).

 Ms. Smith was a CPA with a master's degree in finance. She was also accredited in business valuation by the American Institute of CPA's, was a certified valuation analyst in the National Association of Certified Valuation Analysts, and was an accredited senior appraiser in the American Society of Appraisers. She had twelve years experience valuing businesses as a public accountant and another thirteen years experience valuing businesses for acquisition for her previous employers.

She testified to her opinion that the $118,995 paid to HFS for the subsidiaries did not represent their fair market value, and that the amount was not reached by a recognized valuation methodology. Ms. Smith testified to the three recognized methodologies for valuing a business, the market approach, the income approach, and the asset approach,[6] and explained how each approach worked. Ms. Smith testified that the market approach and the income approach were each appropriate valuation methods for valuing the transferred subsidiaries in this case. She explained that the asset approach was inappropriate because the subsidiaries had goodwill, and the asset approach assumes the absence of goodwill. She used the market approach in her valuation because the necessary data was available. This approach required her to look at "transactions in the marketplace of privately held companies, and sometimes publicly traded companies, and determine [ ] certain multiples of their selling price to revenue, selling price to assets, [and] selling price to EBIT," which she explained was Earnings Before Interest, Taxes, Depreciation, and Amortization. Ms. Smith found the data to make these comparisons in a number of different databases to which she had access that contained market multiples, and she also looked at the market multiples that defendants' expert, Mr. Barrington, had in his research. She testified that the multiples taken from the database Pratt's Stats showed fair market value indicators ranging from $4,000,000 to $20,000,000. She further testified that Mr. Barrington's market value indicators indicated a fair market value ranging from $2,000,000 to $8,400,000. From this data she concluded that the range of values for the subsidiaries was $2 million to $20 million, and that

---

6. Jay Barrington, defendant's valuation expert, also testified that these were the three

accepted valuation methods.

the precise value of the subsidiaries fell somewhere within that range.

Ms. Smith further concluded from the market indicators that the selling price of $118,995 was "grossly outside the range of market indicators for the fair market value of these entities." She explained that she was asked to look at whether the sales transaction price was fair market value. Because of the magnitude of the disparity between the selling price and the range of values, it was not necessary to determine the exact value of the subsidiaries.

The trial court agreed with Ms. Smith that the market approach, and not the asset approach, was the proper method for valuing the subsidiaries:

> The Stock Transfer accomplished a diversion of the income stream of the management fees paid by the subsidiaries from HFS to Longrow. This income stream was substantial and more accurately reflected the value of HFS. The use of the asset approach to reach fair market value for the reason the income stream is not protected by a non-compete agreements, is not persuasive in this situation here in which the principals were all the same, continued doing the same thing, and had no reason to agree to not compete with themselves.

In determining whether Ms. Smith's opinions were based on facts and data reasonably relied upon by other experts in her field, the trial court was free to defer to her assessment of the facts and data as a basis for valuing HFS and the subsidiaries. *See CADCO, Inc.*, 220 S.W.3d at 434. Further, the sources Ms. Smith relied on in formulating her opinions were not so slight as to be fundamentally unsupported. *See Keyser*, 81 S.W.3d at 169; *Doe*, 207 S.W.3d at 62; *Scott*, 215 S.W.3d at 176.

■ Defendants' argument that Ms. Smith's testimony was inadmissible because she did not perform a full valuation of the subsidiaries to reach a specific valuation is without merit. Defendants' argument conflates plaintiff's burden of proof with the admissibility of expert testimony. One of the statutory elements of a MUFTA violation is that the debtor made the transfer "[w]ithout receiving a reasonably equivalent value in exchange for the transfer." Section 428.024.1(2). In this case, the subsidiaries were transferred for $118,995. Plaintiff's burden was to show that this consideration was not a reasonably equivalent value for the subsidiaries. Plaintiff's expert, Ms. Smith, was called to give her opinion that the transfer of the subsidiaries was not for fair market value. She was able to do this by demonstrating that the range in which the fair market value of the subsidiaries fell was far above the consideration paid for the subsidiaries. Defendants' challenge to Ms. Smith's opinion for failure to do a full valuation has no merit because plaintiff was not required to show a specific value of the subsidiaries in order to show that the consideration paid for the subsidiaries was far below any possible fair market value.

Defendants also argue under this point that Ms. Smith's valuation of the subsidiaries was unreliable and thus inadmissible because it assumed the existence of "hypothetical non-compete agreements between the subsidiaries and Winkelmann and Weir to support her opinion." In support of this argument, defendants cite a passage from Ms. Smith's testimony on direct and a passage from Ms. Smith's testimony on cross-examination. Neither of these passages supports a conclusion that Ms. Smith relied on the existence of hypothetical non-compete agreements in forming her opinion. In the passage on direct, Ms. Smith was merely explaining why a buyer would require a non-compete agreement in an arms-length sale of a service business. In the passage on cross-examination, Ms.

Smith was explaining that the subsidiaries would have little value to an outside arms-length buyer without a covenant not to compete. Ms. Smith testified that such an agreement did not make sense when the buyer and seller were commonly owned, and that in this case, there was no need for Mr. Winkelmann or Mr. Weir to sign a non-compete agreement with Longrow because they owned it and there was no risk to cash flow. The record clearly refutes defendants' claim that Ms. Smith relied on the existence of hypothetical non-compete agreements in valuing the subsidiaries.

The trial court did not abuse its discretion in admitting Ms. Smith's valuation testimony. Point one is denied.

## II. *Sufficiency of the Evidence*

 For their second point, defendants assert that the trial court's judgment was not supported by substantial evidence because the judgment was premised on the "inadmissible and wholly unreliable" testimony of plaintiff's expert, Ms. Smith, about the value of the subsidiaries on the date of the stock sale. For their fourth point, defendants assert that the trial court erred in awarding plaintiff a judgment in the amount of $2,000,000 because "section 428.044 RSMo. limits the judgment to the *lesser* of the value of the assets transferred or the underlying debt [7] in that the only admissible and substantial evidence of the value of the transferred assets was the testimony of defendants'

expert, who valued the assets transferred at $109,110.00." They conclude that, as a result, the judgment was not supported by substantial evidence.

In our discussion of defendant's first point, we determined that the trial court did not abuse its discretion in finding that Ms. Smith's testimony was based on facts and data that were reliable and in admitting Ms. Smith's testimony. Since this is the only basis for defendant's claim that the evidence was insufficient to support the findings, point two is denied.[8]

Point IV again assumes that Ms. Smith's testimony was not admissible, a contention we have rejected. Ms. Smith opined that the value of the assets transferred was within a range of $2,000,000 to $20,000,000. She reached the bottom number of this range, the $2,000,000, by reviewing defendants' expert's market multiples. Ms. Smith's testimony constitutes substantial evidence supporting the judgment in the amount of $2,000,000. Point four is denied.

## III. *Double Recovery*

 For their third point, defendants maintain that the trial court erred in setting aside the stock sale and in entering a judgment against Longrow in the amount of $2,000,000 because the judgment constituted an impermissible double recovery in that it made plaintiff whole twice. In their argument, defendants explain that the trial court's judgment setting aside the transfer

---

7. Section 428.044.2 provides:

> 2. Except as otherwise provided in this section, to the extent a transfer is voidable in an action by a creditor under subdivision (1) of subsection 1 of section 428.039, the creditor may recover judgment for the value of the asset transferred, as adjusted under subsection 3 of this section or the amount necessary to satisfy the creditor's claim, whichever is less.

8. We also point out that this point may equally be denied on an independent ground. The trial court not only found grossly inadequate consideration for the transfer but also found actual intent to hinder, delay, or defraud a creditor, which is a separate basis for finding a fraudulent transfer under section 428.024.1. Defendants do not challenge the evidence supporting the finding of actual intent. *See Kratky v. Musil*, 969 S.W.2d 371, 376–77 (Mo. App.1998).

and awarding $2,000,000 to plaintiff puts plaintiff in a better position than if the transfer had not occurred. We disagree.

The Third Amended Final Judgment incorporated the findings in the Findings of Fact, Conclusions, and Amended Final Judgment, including paragraph 15, which stated:

15. Accordingly, the Court finds the subsidiaries were wrongfully transferred by the Stock Purchase of August 15, 2002, and hereby sets aside that transfer as void. In order for there to be an equitable result for the Creditor, the Court also enters judgment in favor of Plaintiff and against Longrow (the first Transferee) for the minimum value of the asset transferred, $2,000,000 (Two Million Dollars).... As the judgment of $2,000,000 against Longrow is derivative of the underlying Consent Judgment of June 20, 2006 by HFS, any sums received on the Judgment in this cause, not including any sums received for the attorney's fees component of this Judgment, shall also be credited to the Consent Judgment of June 20, 2006 of HFS.

MUFTA allows the following remedies in a creditor's action for relief against a fraudulent transfer:

(1) Avoidance of the transfer or obligation to the extent necessary to satisfy the creditor's claim;

(2) An attachment or other provisional remedy against the asset transferred or other property of the transferee ...;

(3) Subject to applicable principles of equity and in accordance with applicable rules of civil procedure, ...

 (a) An injunction ...;

 (b) Appointment of a receiver ...; or

 (c) Any other relief the circumstances may require.

Section 428.039.1. Section 428.039.1(3)(c) "expressly grants courts the authority to employ the full array of remedial measures insofar as they are warranted under the particular facts of the case." *Volk Const. v. Wilmescherr Drusch Roofing*, 58 S.W.3d 897, 900 (Mo.App.2001). Thus, under this section of the statute, a trial court has the authority to set aside a fraudulent transfer; place a lien on the asset transferred, or other property of the transferee; or grant other relief required by the circumstances.

In addition, section 428.044.2 allows a creditor to obtain a money judgment against the first transferee of an asset:

Except as otherwise provided in this section, to the extent a transfer is voidable ... the creditor may recover judgment for the value of the asset transferred ... or the amount necessary to satisfy the creditor's claim, whichever is less. The judgment may be entered against:

(1) *The first transferee of the asset* or the person for whose benefit the transfer was made....

(Emphasis added.)

Here, the trial court found that the subsidiaries were fraudulently transferred to Longrow and set aside the transfer as void. As a result, pursuant to section 428.044.2, the trial court had the authority to enter a judgment against Longrow for $2,000,000, which it found to be the minimum value of the assets transferred. This was not a double recovery. By voiding the transfer, the trial court merely restored the assets to HFS, making them available for execution by plaintiff; it did not give a monetary award to plaintiff. The sole money judgment awarded to plaintiff was the $2,000,000 judgment.

Further, in paragraph 15 of the trial court's Findings of Fact, Conclusions, and Amended Final Judgment, the trial court ordered all sums received on the money

judgment to be credited to the $2,200,000 consent judgment against HFS. As a result, any money received by plaintiff from defendants cannot exceed the amount owed by HFS to plaintiff on the consent judgment, thereby preventing plaintiff from being placed in a better position than it would have been had the fraudulent transfer not taken place.

The trial court's judgment did not give a double recovery to plaintiff. The trial court did not misapply the law. Point three is denied.

### PLAINTIFF'S APPEAL

For its sole point in its appeal, plaintiff asserts that the trial court erred in entering judgment in favor of the individual defendants, Mr. Weir and Mr. Winkelmann, on plaintiff's conspiracy count because "there was substantial evidence that the individual defendants conspired to fraudulently transfer the four subsidiaries in that they personally planned the stock transfer and actively caused it to happen in order to receive a personal benefit."

■■ This point and the argument supporting it are based on an erroneous assumption about the standard of review in a court-tried case. We may review a judgment to determine whether the judgment was supported by substantial evidence; we do not review a judgment to determine whether substantial evidence exists that would support a different judgment. *See Murphy,* 536 S.W.2d at 32.

Moreover, plaintiff's theory of individual liability for conspiracy between corporate officers and the corporation ignores the applicable law. Plaintiff's individual liability theory is based on an argument that individuals can conspire to commit a fraudulent transfer, citing *Fischer v. Brancato,* 147 S.W.3d 794, 798 (Mo.App.2004), and that corporate officers and directors can be personally liable for their tortious acts

if they had "actual or constructive knowledge of, and participated in, an actionable wrong," citing *State ex rel. Doe Run Resources Corp. v. Neill,* 128 S.W.3d 502, 505 (Mo. banc 2004). Neither of these cases directly addresses an officer's liability as a co-conspirator with the corporation. Unlike the situation in this case, the individual defendant in *Fischer* was the debtor on the avoided debt, and the corporations were not debtors on the avoided debt. The *Fischer* court did not address the general rule or exception governing conspiracy between a corporate officer and a corporation; rather it held that the debtor's acts violated MUFTA and that he was liable without piercing the corporate veil. *Doe Run* addressed the circumstances in which a tort claim could be stated directly against a corporate officer; it did not address corporate officer liability on a conspiracy claim.

This case, in contrast, involves an attempt to hold corporate officers liable as conspirators with the corporation. The principles governing when a tort claim can be stated against a defendant based on his or her status as a corporate officer do not apply. 10 Fletcher Cyclopedia Corporations section 4884 (2001 & Cum.Supp. 2008–09). Rather, principles of conspiracy liability apply. *Id.*

■■ "A 'civil conspiracy' is an agreement or understanding between persons to do an unlawful act, or to use unlawful means to do a lawful act." *Oak Bluff Partners, Inc. v. Meyer,* 3 S.W.3d 777, 780–81 (Mo. banc 1999). *See also Royster v. Baker,* 365 S.W.2d 496, 499 (Mo.1963). Civil conspiracy is not a cause of action in and of itself; rather, it acts to hold the conspirators jointly and severally liable for the underlying act. *Trimble v. Pracna,* 51 S.W.3d 481, 501 (Mo.App.2001). *See also Royster,* 365 S.W.2d at 500; *Mark VII, Inc. v. Barthol,* 926 S.W.2d 128, 131

(Mo.App.1996). "The gist of the action is not the conspiracy, but the wrong done by acts in furtherance of the conspiracy or concerted design resulting in damage to plaintiff." *Royster*, 365 S.W.2d at 496.

As a general rule, there can be no conspiracy between an agent and a principal. *Mika v. Central Bank of Kansas City*, 112 S.W.3d 82, 94 (Mo.App.2003). "Two entities that are not legally distinct cannot conspire with one another." *Id.* Specifically, a corporation cannot conspire with its own employees. *Id. See also John Deere Company of St. Louis v. Short*, 378 S.W.2d 496, 501 (Mo.1964); *Metts v. Clark Oil & Refining Corp.*, 618 S.W.2d 698, 702 (Mo.App.1981). We have recognized a limited exception to this rule when an agent has an "independent personal stake" in achieving the object of the conspiracy. *Mika*, 112 S.W.3d at 94; *Creative Walking v. American States Ins. Co.*, 25 S.W.3d 682, 688 n. 3 (Mo.App.2000); *Metts*, 618 S.W.2d at 702. The agent must act out of a self-interest that goes beyond the agency relationship. *Creative Walking*, 25 S.W.3d at 688 n. 3; *Metts*, 618 S.W.2d at 702. Job security and increased compensation do not constitute such an independent interest. *Mika*, 112 S.W.3d at 94. Rather, the agent's independent personal stake must be in a legally distinct organization. *Id.*; *Metts*, 618 S.W.2d at 702.[9]

The trial court found that the transfer to Longrow personally benefited Mr. Weir and Mr. Winkelmann, because Mr. Weir and Mr. Winkelmann had not personally guaranteed HFS's debts but had guaranteed Longrow's debts.[10] However, this finding is not inconsistent with its denial of relief on the conspiracy count because this personal benefit was not equivalent to an independent personal stake in the object of the conspiracy that we have required for the exception to apply, and plaintiff does not point to any evidence of such an independent personal stake.

A conspiracy must be proved by clear and convincing evidence. *National Rejectors, Inc. v. Trieman*, 409 S.W.2d 1, 50 (Mo. banc 1966). This means that "the court should be clearly convinced of the affirmative of the proposition to be proved." *Grissum v. Reesman*, 505 S.W.2d 81, 86 (Mo.1974). The trial court did not err in concluding that plaintiff did not sustain its burden of proof on the conspiracy count against the individual defendants. Point denied.

*Conclusion*

The judgment of the trial court is affirmed.[11]

MARY K. HOFF, J., and KURT S. ODENWALD, J., concur.

---

9. We adopted the "independent personal stake" exception from a federal anti-trust case, *Coleman Motor Co. v. Chrysler Corporation*, 525 F.2d 1338, 1345 (3d Cir.1975). For a full discussion of the concept that an "independent personal stake" requires an agent to act to further a financial interest in a legally distinct organization rather than from any other motivating personal interest, *see Siegel Transfer, Inc. v. Carrier Express, Inc.*, 54 F.3d 1125, 1135–37 (3d Cir.1995) and *H & B Equipment Co., Inc. v. International Harvester Co.*, 577 F.2d 239, 244 (5th Cir.1978).

10. Plaintiffs also rely on comments the trial court made during one of the hearings explaining its understanding of the testimony at that point in the proceedings. We do not treat these comments as findings of fact or otherwise as part of the judgment. *Jantz v. Brewer*, 30 S.W.3d 915, 919–20 (Mo.App. 2000).

11. Defendants' motion to strike plaintiff's "reply" to points one through four of defendants' reply brief is granted. Rule 84.04(j). *See Clayton Center Associates v. W.R. Grace &*

*Company,* 861 S.W.2d 686, 689 (Mo.App. 1993).