**Danny WHITELEY, Employee–Respondent,**

v.

**CITY OF POPLAR BLUFF, Employer–Appellant.**

No. SD 31287.

Missouri Court of Appeals, Southern District, Division Two.

Oct. 11, 2011.

Paul D. Huck, Clayton, MO, for Appellant.

Jack H. Knowlan, Jr., Cape Girardeau, MO, for Respondent.

WILLIAM W. FRANCIS, JR., Presiding Judge.

The City of Poplar Bluff ("City") appeals a unanimous decision by the Labor and Industrial Relations Commission ("Commission") awarding worker's compensation benefits to Danny Whiteley ("Whiteley"). We affirm the decision of the Commission.

### Facts and Procedural Background

Whiteley started as the chief of police with the Poplar Bluff Police Department ("PBPD") in June 2000, and has continued to work for City. Whiteley's job duties required him to oversee all operations of the PBPD. Prior to his employment with City, Whiteley spent several years as a professional bull rider. Whiteley was sixty-three years old at the time of the hearing.

On October 29, 2006 (the "2006 accident"), after Whiteley finished patrolling a designated high-crime-rate area, he went to a car wash to clean his patrol car. Whiteley was attempting to wash the inside of the windshield when he injured his neck. He was standing outside of the patrol car on the driver's side with the front door open, and leaned inside the car reaching with a rag to clean the windshield behind the steering wheel. As Whiteley extended his arm to clean the windshield, he felt a tearing sensation in his neck. Whiteley had an immediate onset of pain on the right side of his neck, and later developed a muscle spasm that caused a visible knot on the right side of his neck.

Whiteley testified that having clean patrol cars was important for the City's image, and for safety reasons. If the windshield was dirty or had a film on the

inside, it could create impaired visibility, especially at night. Whiteley also noted that it was critical for police officers to be able to see and observe things clearly when driving their patrol cars. It was an integral part of the job. Police officers with the PBPD were responsible for keeping their patrol cars "as clean and uncluttered as possible." This job-related duty was documented in paragraph "I. Vehicle Use," subparagraph B.3. of the "MOTOR EQUIPMENT" policy. Additionally, the officers used a "VEHICLE EQUIPMENT SAFETY CHECKLIST" that required them to periodically check the equipment and other listed items on their patrol cars. One of the categories on the checklist was "WINDSHIELD (CLEAN)." To assist the police officers with this responsibility, City had a designated area at the PBPD where the officers washed their patrol cars and cleaned the windows, with City furnishing water, a commercial vacuum cleaner, and other supplies.

Higher ranking officers with the PBPD, including Whiteley, were assigned their own patrol cars. The officers, as part of their assigned duties, were generally expected to wash their patrol cars and clean the windows at the end of each shift. Whiteley testified that depending on the weather, he normally washed his patrol car and cleaned the windows one or more times each week. As chief of police it was important for Whiteley to set a good example and keep his patrol car clean.

On October 30, 2006, City authorized Whiteley to get medical treatment at Ozark Foothills Industrial Medicine Clinic with Dr. Austin R. Tinsley.[1] Whiteley initially saw Nurse Practitioner Amy Robertson. Her assessment was an acute right cervical spasm. She prescribed Skelaxin, Flexeril and therapy. Later that same day, Whiteley went to see Dr. Tinsley at the Tinsley Medical Clinic where he received a Torodol injection.

Whiteley returned to Dr. Tinsley on November 1, 2006. Dr. Tinsley noted Whiteley could only rotate his head approximately 45 degrees either way. Dr. Tinsley diagnosed Whiteley with "[a]cute cervical strain" and "suspect[ed] some preexisting cervical DJD [degenerative joint disease] noting multiple trauma [Whiteley] sustained when riding bulls."

On November 9, 2006, City notified Whiteley it was denying Whiteley's claim and advised him that he would have to use his personal insurance to obtain treatment.

On November 10, 2006, Dr. Tinsley ordered an MRI of Whiteley's cervical spine. The MRI findings included degenerative disc disease and some disc bulging in the cervical spine.

On November 13, 2006, Whiteley returned to see Dr. Tinsley and his impression was, "Acute cervical strain, superimposed on severe cervical disc disease, post traumatic from multiple injuries in the past." When questioned about what Dr. Tinsley meant by "multiple injuries in the past," Whiteley explained Dr. Tinsley had treated him for several injuries he suffered from bull riding, but that he had no prior injuries or treatment for his neck.

On November 20, 2006, Whiteley saw Dr. Tinsley again and reported persistent, worsening neck pain. Dr. Tinsley referred Whiteley to Dr. Yuli Soeter, a pain management specialist. Dr. Soeter noted that Whiteley had "lost the range of motion of his cervical spine completely." Dr. Soeter's diagnosis was: (1) cervical disc displacement, without myelopathy; (2) right occipital nerve neuralgia; and (3) spinal enthesopathy, right paracervical region. Dr. Soeter's plan and treatment included

1. Dr. Tinsley also practiced medicine at the Tinsley Medical Clinic.

cervical epidural injections, trigger point injections, a right occipital nerve block and physical therapy. Whiteley received the injections, nerve block and therapy.

Whiteley's final visit with Dr. Tinsley occurred on December 4, 2006. Dr. Tinsley's exam revealed "much less spasm, no dysesthesias, otherwise normal except for some pain at extremes." Whiteley concluded his treatment with three physical therapy sessions at Ozark Physical Therapy on December 12, 14 and 15, 2006.[2]

On December 6, 2006, Whiteley filed his "Claim for Compensation" against City, including therein a claim against the Second Injury Fund ("SIF") for injuries to his left upper/lower extremity and right lower extremity.[3] Whiteley did not miss work and did not make any claim for temporary total disability.

Whiteley testified he still had constant right neck pain in the area where the knot or spasm was located and described problems he had in doing his job. Whiteley rated his pain at a six or seven out of ten at its worst when doing these activities. On a normal day, Whiteley rated his neck pain in the range of two to four out of ten. Whiteley relieved the pain in his neck by taking Motrin daily and hydrocodone occasionally. He also did pressure point treatments that were suggested by Dr. Soeter.

During the three years preceding his 2006 accident, Whiteley indicated that with the exception of occasional stiffness, he did not have any symptoms in his neck and his neck did not bother him or affect his ability to do his job. Whiteley explained he had an immediate onset of symptoms after his 2006 accident. He also agreed that while he may have had pre-existing degenerative conditions in his cervical spine, he was unaware of those conditions.

During his bull riding career, Whiteley had several significant injuries including fractured ribs, fractures to his right tibia/fibia, an injury to his right arm, and an injury to his left shoulder. Both Whiteley's testimony and the medical records confirmed he did not have any injuries or significant treatment for his cervical spine or neck before his 2006 accident.

On July 15, 2002 ("2002 accident"), Whiteley also had a claim resulting from a suspect intentionally rear-ending his patrol car. Both the claim and the compromise settlement agreement, listed "back, neck and shoulders" as the parts of the body injured in the 2002 accident. The compromise settlement agreement for this injury was based on approximately 6% of the body as a whole related to the neck, back and shoulders. Whiteley recalled signing that agreement, but did not agree he suffered any injury to his neck as a result of the 2002 accident. Whiteley stated that his neck may have been a little sore, but his injury and all of his treatment, was to the mid-back or thoracic spine.

Dr. Tinsley noted on June 23, 2003, that Whiteley had an "[o]ld workmen's comp injury ... had a whiplash type injury[ ]";

---

**2.** In November and December 2006, Whiteley was having more serious health problems that included weight loss, fatigue, fever, abdominal pain and anemia. He was eventually diagnosed with endocarditis, which is a bacterial infection of the heart, and a mitral valve prolapse. Whiteley was treated with I.V. antibiotics and surgery. Whiteley also developed a blood clot and cerebral hemorrhage in March 2007. Whiteley recovered from both of these illnesses and returned to work.

**3.** The Administrative Law Judge ("ALJ"), in her award, found that based on her denial of medical causation, there was no valid SIF claim and dismissed Whiteley's claim against the SIF. Whiteley did not challenge the ALJ's ruling as to the SIF claim in his Application for Review to the Commission. SIF is not a party in this appeal.

however, Dr. Tinsley never mentioned Whiteley's neck in this record. Earlier records established that all of Whiteley's treatment after the 2002 accident was for pain in the thoracic area. An MRI ordered by Dr. Tinsley on September 13, 2002, showed "CONSISTENT BACK PAIN FOLLOWING MVA." The MRI was a scan of the thoracic spine to L3, and did not include the cervical spine. There were no records of any x-rays or MRI's of the cervical spine after the 2002 accident. The extensive medical records of Dr. Tinsley go back to 1979, and there are no references to Whiteley's neck or cervical spine before his 2006 accident.

On January 20, 2005, Whiteley obtained an independent medical evaluation ("IME") and report from Dr. Raymond Cohen for his 2002 accident. Dr. Cohen diagnosed Whiteley with "[m]oderately severe thoracic myofacial pain disorder." Dr. Cohen gave a rating of "20% whole person disability at the level of the thoracic spine." He did not diagnose any injury or assign any disability to Whiteley's cervical spine or neck.

The records of Whiteley's chiropractor, Dr. Jack Rushin, indicate Whiteley made regular visits for adjustments from 2001 through the date of Whiteley's 2006 accident. Whiteley's primary complaint was discomfort in his low back. Although Whiteley had periodic adjustments to his lumbar, thoracic, and cervical spine, Whiteley emphasized that these adjustments were done to his whole spine regardless of his complaints and were merely a part of the "chiropractic theory of treatment." Out of approximately 51 treatment records of Dr. Rushin, there were only two records indicating Whiteley had any specific complaints or symptoms to his cervical spine. The first record, dated May 25, 2001, stated Whiteley had "[s]tiffness in lumbosacral spine and neck."

The second record, dated September 12, 2003, stated Whiteley "still has discomfort in his right mid back." "Furthermore[,] [Whiteley] remarked of discomfort in his right neck." On October 10, 2003, less than one month later, Whiteley reported to Dr. Rushin that "the pain in his neck has been doing better, no pain at this time since last visit."

On August 29, 2008, Dr. Thomas F. Musich performed an evaluation of Whiteley, at Whiteley's request. Dr. Musich's IME report of the same date was admitted into evidence. Other than one medical record of Dr. Rushin in September 2003, Dr. Musich found no history of any pre-existing problems with Whiteley's neck or cervical spine. Dr. Musich's physical examination revealed "straightening of the normal cervical lordosis[;] . . . focal subjective pain to deep palpation over the right paracervical musculature with spasm palpable[;] . . . a loss of 20% cervical extension[;] and a loss of 25% right cervical rotation and right cervical lateral flexion due to end range pain." Dr. Musich reached the following conclusions regarding the primary injury:

It is my opinion, based upon a reasonable degree of medical certainty that Danny Whiteley suffered significant work related neck trauma on or about October 29, 2006 during the course and scope of his employment by The City of Poplar Bluff Police Department. It is my medical opinion that the work trauma of October 29, 2006 is the prevailing factor in the development of acute and severe right neck pain which required extensive evaluation and aggressive conservative treatment. It is my medical opinion that the work trauma of October 29, 2006 is causally related to this patient's persistent post traumatic neck symptoms due to symptomatic cervical disc displacement, right occipital nerve neuralgia and symptomatic spinal en-

thescopy of the right paracervical region.

On January 14, 2009, at City's request, Dr. Russell C. Cantrell evaluated Whiteley and detailed his findings in a report of the same date. Dr. Cantrell's deposition was also taken. Dr. Cantrell reviewed Whiteley's medical records and other documents related to medical treatment both before and after the 2006 accident. Dr. Cantrell mentioned Dr. Tinsley's June 23, 2003 record in which he referenced an "[o]ld workmen's comp injury" in which Whiteley had a "whiplash type injury." Dr. Cantrell acknowledged, however, that the trigger point injection for that injury was in the inferior medial scapular area to T–11, and not to Whiteley's neck. During Dr. Cantrell's discussion of the 2002 accident, he focused on the fact that both the claim for compensation and the compromise settlement agreement listed injury to Whiteley's neck, back and shoulders. Dr. Cantrell agreed, however, that the treatment after the 2002 accident was for the thoracic spine and there was no record of any treatment for Whiteley's neck. Dr. Cantrell also acknowledged that in Dr. Cohen's IME report for the 2002 accident, Whiteley's current complaints did not include any reference to his neck. Dr. Cohen's report also indicated that he did not perform an examination of Whiteley's cervical spine. Dr. Cantrell also agreed that Dr. Cohen's diagnosis and disability rating for the 2002 accident were for an injury to the thoracic spine and did not include Whiteley's neck.

Dr. Cantrell also reviewed the chiropractic records of Dr. Rushin. Dr. Cantrell emphasized that these records indicated Whiteley had limited range of motion in his cervical spine and received regular adjustments that included his cervical spine. Dr. Cantrell then agreed that the chiropractic records did not support a conclusion that Whiteley had a pattern of neck pain before his 2006 accident.

In his report, Dr. Cantrell concluded "within a reasonable degree of medical certainty, that the events of October 29, 2006, [were] not the prevailing factor in the cause of [Whiteley's] medical condition for which he received extensive treatment. . . ." He noted that the activities Whiteley described in cleaning the windshield "may have served as a contributing factor to a diagnosis of a cervical strain superimposed on preexisting degenerative disk disease within [Whiteley's] cervical spine. . . ." Dr. Cantrell went on to explain the findings on the MRI represented a "progressive degenerative process, not uncommonly seen in an individual of Whiteley's age" and that his opinion was further supported by the chiropractic findings. Dr. Cantrell gave Whiteley a 5% permanent partial disability of the person as a whole referable to Whiteley's cervical spine pain complaints, 4% to pre-existing degenerative pathology, and 1% to a diagnosis of cervical strain referable to the 2006 accident. Dr. Cantrell also stated, "It is lastly my opinion that it is equally likely that Mr. Whiteley may have experienced similar onset of pain complaints if he were engaged in similar activities of washing a vehicle outside the scope of his employment."

During cross-examination, Dr. Cantrell agreed that Whiteley's neck was basically asymptomatic and he was not having any neck pain before his 2006 accident. Dr. Cantrell also agreed that both he and Dr. Tinsley diagnosed Whiteley with an acute cervical strain superimposed on cervical degenerative disc disease, and that there was no medical evidence Whiteley received any treatment for neck pain before his 2006 accident. Dr. Cantrell acknowledged Whiteley received extensive conservative treatment and it was close in time to the

2006 accident. Dr. Cantrell admitted Whiteley's cervical sprain/strain was "a new injury" and he assigned permanent partial disability because of that new injury. Dr. Cantrell also agreed that if Whiteley had not had the 2006 accident, Whiteley would not have needed medical treatment at that time.

Whiteley testified that the charges included in the medical bills summary and corresponding medical bills, which were introduced into evidence, were related to treatment for his neck after his 2006 accident. None of the medical bills included in the summary had been paid by City. The total amount of the medical bills was $5,740.67.

On March 30, 2010, Whiteley's worker's compensation claim against City was heard. On July 1, 2010, the ALJ issued her award finding: (1) that "based on all of the evidence presented . . . the causation opinion of Dr. Cantrell [was] more credible than the causation opinion of Dr. Musich"; (2) that "[Whiteley's] cervical injuries sustained on October 29, 2006[,] [were] not medically causally related to [Whiteley's] alleged work accident[ ]"; (3) that "[Whiteley's] alleged work accident . . . [was] not the prevailing factor in causing [Whiteley's] medical condition[ ]"; and (4) that "[b]ased on the denial of medical causation, all other issues [were] moot[,] . . . will not be ruled upon[,] . . . [and] the primary claim has been denied."

Subsequently, Whiteley filed his "Application for Review" with the Commission. On March 22, 2011, the Commission issued its Final Award reversing the ALJ's award finding that the 2006 accident "was the prevailing factor in causing [Whiteley's] cervical spine condition . . . [and] that [Whiteley] shall be awarded past medical expenses and permanent partial disability benefits." The Commission also awarded: (1) $5,740.67 in past medical expenses; (2) 7.5% permanent partial disability to the body as a whole rated at the cervical spine or $11,296.50; (3) credit to City in the amount of $123.26 for overpayment of mileage expense; and (4) attorney fees. This appeal followed.

■ City contends the Commission erroneously interpreted and applied section 287.020.3 as to the definition of "accident" [4] because undisputed facts show Whiteley was not engaged in work activity integral to his employment, and that the Commission's decision was not supported by competent and substantial evidence in that it disregarded evidence of Whiteley's pre-existing injuries. City further contends the Commission erred in awarding Whiteley past medical expense.

The issues for our determination are:

1. Did the Commission err in concluding Whiteley sustained an injury by accident because the facts showed Whiteley was not engaged in work integral to his employment?

2. Did the Commission ignore evidence that Whiteley had a pre-existing neck condition severe enough to defeat the award which concluded his neck injury was caused by his work?

3. Was the award of past medical expenses of $5,740.67, proven to be

4. While City's first point relied on alleges error in the Commission's interpretation and application of the term "accident" under section 287.020.3, City fails to specifically develop this part of the argument and more narrowly focuses its argument on the application of section 287.020.3(2)(b) regarding whether Whiteley was engaged in any work activity integral to his employment. When matters referenced as alleged error in a point relied on are not developed in the argument portion of a brief, they are deemed abandoned. *8000 Maryland, LLC v. Huntleigh Fin. Services Inc.,* 292 S.W.3d 439, 445 (Mo.App. E.D.2009).

medically necessary and causally related to Whiteley's work injury?

## Standard of Review

 As set forth in article V, section 18 of the Missouri Constitution, judicial review of the Commission's award is a determination of whether the award is "supported by competent and substantial evidence upon the whole record." *Hampton v. Big Boy Steel Erection*, 121 S.W.3d 220, 222 (Mo. banc 2003). Pursuant to section 287.495.1,[5] this Court

> shall review only questions of law and may modify, reverse, remand for rehearing, or set aside the award upon any of the following grounds and no other:
>
> (1) That the commission acted without or in excess of its powers;
>
> (2) That the award was procured by fraud;
>
> (3) That the facts found by the commission do not support the award; [and]
>
> (4) That there was not sufficient competent evidence in the record to warrant the making of the award.

§ 287.495.1; *Hampton*, 121 S.W.3d at 222. An award that is clearly contrary to the overwhelming weight of the evidence is, in context, not supported by competent and substantial evidence. *Id.* at 223. This Court "must determine whether the Commission reasonably could have made its findings and reached its result based upon all of the evidence before it." *Fitzwater v. Dept. of Public Safety*, 198 S.W.3d 623, 627 (Mo.App. W.D.2006). This Court defers to the Commission on issues involving the credibility of witnesses and the weight to be given to their testimony. *Sell v. Ozarks Med. Ctr.*, 333 S.W.3d 498, 506 (Mo.App. S.D.2011). While we defer to the Commis-

sion on issues of fact, we review questions of law *de novo*. *Id.*

## Point I: Whiteley Sustained an Injury by Accident

City first contends the Commission erroneously interpreted and applied section 287.020.3 in ruling Whiteley sustained an injury by accident because the undisputed facts show Whiteley was not engaged in any work activity integral to his employment, and was equally likely to experience similar onset of neck injury while performing similar movements outside his employment. We disagree.

Section 287.020.3(2) provides:

> An injury shall be deemed to arise out of and in the course of employment only if:
>
> (a) It is reasonably apparent, upon consideration of all the circumstances, that the accident is the prevailing factor in causing the injury; and
>
> (b) It does not come from a hazard or risk unrelated to the employment to which workers would have been equally exposed outside of and unrelated to the employment in normal nonemployment life.

Here, City specifically contests the Commission's finding as to section 287.020.3(2)(b). In *Pile v. Lake Regional Health System*, 321 S.W.3d 463 (Mo.App. S.D.2010) this Court explained that the application of this subsection involves a two-step analysis:

> The first step is to determine whether the hazard or risk is related or unrelated to the employment. Where the activity giving rise to the accident and injury is integral to the performance of a worker's job, the risk of the activity is related to employment. In such case, there is a clear nexus between the work and the injury.

---

**5.** All references to statutes are to RSMo Cum. Supp. (2005), unless otherwise indicated.

*Id.* at 467. Significantly, this Court determined that

> [w]here the work nexus is clear, there is no need to consider whether the worker would have been equally exposed to the risk in normal non-employment life. Only if the hazard or risk is unrelated to the employment does the second step of the analysis apply. In that event, it is necessary to determine whether the claimant is equally exposed to this hazard or risk in normal, non-employment life.

*Id.*

■ Here, Whiteley offered extensive evidence to establish that the activity of keeping the windshield of his patrol car clean was an integral part of his job as a police officer for City, and thus there is a clear nexus between the job of being a police officer and keeping patrol cars clean. Whiteley testified regarding the importance of keeping patrol cars clean and the windows washed for both City's image and for safety reasons.[6] Furthermore, this job-related duty was documented in the "MOTOR EQUIPMENT" policy and the "VEHICLE EQUIPMENT SAFETY CHECKLIST." City also designated an area at the police station with equipment and supplies to assist police officers with this responsibility. It is significant to note that the ALJ included almost all of this evidence in her "Findings of Fact" under "Cleaning of patrol cars."[7] Thus, competent and substantial evidence supported a finding that the activity of keeping patrol cars clean was an integral part of the job of the PBPD officers. City has offered no evidence to refute White-

ley's testimony regarding the nexus between his job, and the activity of cleaning his patrol car that led to his injury.

Because the work nexus is clear in this case, we need not consider whether the worker would have been equally exposed to the risk in normal non-employment life. *See Pile*, 321 S.W.3d at 467. Accordingly, the Commission did not err in concluding Whiteley sustained an injury by accident because the facts demonstrated Whiteley was engaged in work integral to his employment. Point I is denied.

### Point II: Competent and Substantial Evidence Supported Decision

Next, City argues the Commission's decision is not supported by competent and substantial evidence and is contrary to the weight of the evidence in that the Commission improperly disregarded uncontroverted evidence of Whiteley's: (1) prior whiplash injury, (2) pre-existing symptomatic cervical degenerate disc disease, and (3) pre-existing permanent partial disability to the neck presumed to continue under section 287.190.6. The thrust of City's argument is essentially that the Commission should have accepted City's physician expert's opinion over any other evidence.

### (A) Evidence of "Whiplash Injury."

■ City, and its medical expert, repeatedly rely on the fact that Whiteley had a "whiplash type injury" as a result of the 2002 accident. While the phrase "whiplash type injury" typically denotes an injury to the neck, the medical records make it clear that Whiteley injured his thoracic spine rather than his cervical spine in this acci-

---

**6.** The fact that Whiteley was the chief of police and drove an unmarked patrol car is not material because Whiteley, as "chief," agreed he needed to set a good example by keeping his patrol car clean and the need to clean for safety reasons are equally applicable.

**7.** It should also be noted that, to the extent it was not inconsistent with the Commission's award, the Commission attached and incorporated the ALJ's award in its "Final Award."

dent. Although Dr. Tinsley, in his June 23, 2003 record, noted Whiteley had a "whiplash type injury" from an "[o]ld workmen's comp injury," Dr. Tinsley never mentioned Whiteley's neck in this record. Earlier records establish that all of Whiteley's treatment after the 2002 accident was for pain in the thoracic region, including the MRI ordered by Dr. Tinsley which did not include the cervical spine. There was no record of any x-ray or MRI of the cervical spine after the 2002 accident. Additionally, after Dr. Cantrell reviewed the June 23, 2003 record, he agreed that even though the record referred to a "whiplash type injury," Dr. Tinsley actually gave Whiteley an injection in the thoracic spine. The Commission acknowledged this fact in its Final Award.

During a discussion of the 2002 accident, the Commission stated, "There was an MRI scan taken of [Whiteley's] thoracic spine down to L3 and [Whiteley]was given a 20% permanent partial disability rating of the body as a whole at the level of the thoracic spine, but no medical evidence suggested that [Whiteley] suffered a *cervical* spine injury." As such, there is no evidence to support a finding that the Commission improperly and arbitrarily disregarded any alleged uncontroverted evidence of Whiteley's prior whiplash injury to the cervical spine; a whiplash injury to the thoracic spine is not relevant here.

**(B) Pre-existing Symptomatic Cervical Degenerative Disc Disease.**

■ City also contends there was uncontroverted evidence of Whiteley's "pre-existing symptomatic cervical degenerative disc disease." This is also incorrect. While Whiteley did have pre-existing degenerative disc disease, there is no credible evidence to support City's claim that this pre-existing condition was symptomatic. A careful review of the evidence led

both the ALJ and the Commission to conclude that Whiteley did not have any significant symptoms or treatment for his neck or cervical spine prior to his 2006 accident; we agree that this conclusion is supported by the evidence.

In regard to his career as a professional bull rider, Whiteley admitted he had significant injuries, however, Whiteley denied any prior injuries or medical treatment for his cervical spine or neck. Although Whiteley frequently visited the doctor, and had a number of injuries and health problems over the years, none of the participants in this case (attorneys, doctors, ALJ or Commission) have found any entries in the records to support City's argument that Whiteley had a pre-existing symptomatic degenerative disc disease in his cervical spine.

Absent medical records to support its position, City relied on the 2002 compromise settlement records. The 2002 compromise settlement described Whiteley's 2002 accident and the resulting whiplash injury to his thoracic spine. There is only a superficial conclusion that Whiteley injured his neck, back and shoulders as a result of the 2002 accident. The compromise settlement agreement indicates the settlement was based on "an approximate disability of 6% of the body as a whole related to the neck, back and shoulders." Whiteley testified his neck may have been a little sore after the 2002 accident, but his injury and all of his treatment was to the mid-back or thoracic spine.

Dr. Cohen's report refutes City's argument that Whiteley suffered any permanent injury to his neck as a result of the 2002 accident. Dr. Cohen gave a diagnosis of "[m]oderately severe thoracic myofacial pain disorder[ ]"; he rated Whiteley at "20% whole person disability at the level of the thoracic spine"; he did not examine, diagnose, or rate Whiteley's neck or cervi-

cal spine. When Dr. Cohen's report is combined with Dr. Tinsley's treating records after the 2002 accident indicating all of Whiteley's complaints and treatment were to his thoracic spine, it is apparent that the Commission's finding on this issue was supported by competent and substantial evidence and is not contrary to the overwhelming weight of the evidence.

In support of its position that Whiteley had a symptomatic degenerative condition in his cervical spine, City also relies on the chiropractic records of Dr. Rushin. According to City's count, Whiteley received adjustments to his cervical spine in 43 of the 51 chiropractic visits. As noted by both the ALJ and the Commission in their findings, however, out of all the chiropractic visits, there were only two records that indicated Whiteley had any specific complaints or symptoms in his cervical spine. Whiteley acknowledged the regular adjustments to his cervical, thoracic and lumbar spine, but emphasized that this was done to his whole spine regardless of his complaints, and was part of the "chiropractic theory of treatment." A complete review of those records does not support City's suggestion that Whiteley's cervical spine was symptomatic before his 2006 accident.

The final flaw in City's position was the admissions of Dr. Cantrell. Although Dr. Cantrell emphasized Whiteley's cervical degenerative disc problems, he admitted during cross-examination that prior to the 2006 accident, Whiteley was "basically asymptomatic," not having any neck pain and other than chiropractic adjustments, Whiteley was not getting any real treatment. Dr. Cantrell also acknowledged that there was no documentation Whiteley had pain in his neck prior to his 2006 accident because he had no treatment for

neck pain prior to that date. Accordingly, the evidence does not support a finding that Whiteley had pre-existing symptomatic degenerative disease in his cervical spine or any significant treatment for that condition prior to his 2006 accident; the Commission's findings did not ignore evidence and are supported by competent and substantial evidence.

### (C) Pre-existing Permanent Partial Disability Presumed Under Section 287.190.6.

█ City also alleges the Commission "improperly and arbitrarily disregarded" the evidence of pre-existing permanent partial disability to the neck that must be presumed to continue under section 287.190.6(1), which provides:

> *'Permanent partial disability'* means *a disability that is permanent in nature and partial in degree, and when payment therefor has been made* in accordance with a settlement approved either by an administrative law judge or by the labor and industrial relations commission, a rating established by medical finding, certified by a physician, and approved by an administrative law judge or legal advisor, or an award by an administrative law judge or the commission, the percentage of disability shall be conclusively presumed to continue undiminished *whenever a subsequent injury to the same member or same part of the body* also results in permanent partial disability for which compensation under this chapter may be due. . . .

§ 287.190.6(1) (emphasis added).

A full reading of section 287.190.6(1) makes it clear that it does not apply here.[8] As previously noted, the evidence does not

---

8. It should be noted that City's attorney did not raise the possibility of this section being applicable to the facts of this case at either the hearing before the ALJ or while the matter was being reviewed by the Commission.

support a finding that Whiteley suffered any injury or permanent partial disability to his neck or cervical spine as a result of the 2002 accident. Section 287.190.6(1) initially defines permanent partial disability as "a disability that is permanent in nature and partial in degree." The evidence reviewed previously, and the findings of the Commission, confirm Whiteley did not suffer any disability to his neck or cervical spine as a result of the 2002 accident that was "permanent in nature and partial in degree." The "payment therefor" that is required by this section was based on Dr. Cohen's diagnosis and rating of an injury to the thoracic spine. No payment was made for a cervical injury. Thus, the provisions of section 287.190.6(1) are not applicable.

Additionally, section 287.190.6(1) requires the "subsequent injury to the same member or same part of the body also results in permanent partial disability[ ]" in order for the percentage of disability to be conclusively presumed to continue undiminished. The prior settlement was based on an "approximate disability of 6% of the body as a whole related to the neck, back and shoulders." Whiteley did not injure his back and shoulders in the 2006 claim. Neither the parties, nor the judge in the 2002 claim, apportioned the "approximate" disability between the three parts of the body listed. The clear language in section 287.190.6(1) indicates this presumption of continued disability is not applicable unless the "subsequent injury" is to the "same member or same body part" as the injury or injuries described in the earlier settlement or award. One out of three is not enough, especially given the standard of "strict construction" required under section 287.800—any attempt to apply this presumption to the facts of this case would be based on speculation and conjecture in determining how much of the 6%, if any, may have been attributable to the neck.

While the Commission was not asked, and did not mention this section in its Final Award, its award is not inconsistent with a presumption that Whiteley had a pre-existing permanent partial disability of approximately 6% that was attributable to his neck, back and shoulders. The Commission awarded "7.5% of the body as a whole rated at the cervical spine as a result of the October 29, 2006 accident." This qualifying language indicates that even if Whiteley did have some undetermined pre-existing permanent partial disability to his neck attributable to the 2002 accident, the Commission would still have awarded an additional 7.5% disability for his 2006 accident.

The Commission did not ignore evidence that Whiteley had a pre-existing work condition which was severe enough to defeat the award concluding that his neck injury was caused by his 2006 on-the-job injury. Point II is denied.

### Point III: Award for Injection Therapy Not Erroneous

Finally, City argues the Commission erroneously included $4,901.37, in its award for past medical expense for Whiteley's injection therapy because uncontroverted evidence established these treatments were not medically necessary and casually related to Whiteley's work injury. Again, we disagree.

City characterizes Dr. Cantrell's opinion that the medical bills for the series of injections received by Whiteley should not have been awarded as uncontroverted. However, City fails to recognize the Commission in fact considered two conflicting medical opinions. Dr. Cantrell concluded that the "events of October 29, 2006, [were] not the prevailing factor in the cause of [Whiteley's] medical condition for which he received extensive treatment, in-

cluding a series of epidural steroid injections, trigger point injections and occipital nerve blocks." Dr. Musich contradicted that opinion by stating "the work trauma of October 29, 2006[,] is the prevailing factor in the development of acute and severe right neck pain which required extensive evaluation and aggressive conservative treatment." Dr. Musich was aware that "Chief Whiteley underwent a series of epidural steroid injections between November 20, 2006 and December 4, 2006." After discussing and considering all of the evidence, the Commission agreed with Dr. Musich and found that "the overwhelming weight of the evidence suggests that the October 29, 2006[ ] accident was the prevailing factor in causing [Whiteley's] cervical condition." Based on this finding, the Commission awarded past medical expenses.

Additionally, when Dr. Cantrell was asked the basis for his conclusion that the injection therapy was not related to Whiteley's 2006 accident, one of the reasons he gave was that Whiteley had never had radicular pain or numbness or tingling after his accident that would have been "treated appropriately with epidural injections." Dr. Cantrell was unaware of Dr. Tinsley's medical record of November 13, 2006, where Dr. Tinsley noted Whiteley had "good sharp/dull discrimination, although sometimes the right second and third fingers had some dysesthesias.[ ]" This record confirms that Whiteley did have numbness and tingling in the fingers of his right hand. Given this record, it appears Dr. Cantrell's opinion was based on a mistaken assumption that Whiteley did not have any numbness or tingling. The documented complaint of numbness and tingling in fact supports the Commission's finding that the injections were appropriate and related to Whiteley's 2006 accident.

Thus, we find substantial and competent evidence that support the Commission's award of all past medical expenses as necessary and causally related to Whiteley's work injury. Point III is denied.

The decision of the Commission is affirmed.

BARNEY, and SCOTT, JJ., Concur.